## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 31 2015, 10:36 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANTS

Latriealle Wheat
Angola, Indiana

ATTORNEY FOR APPELLEES

James C. Yankosky
Tourkow, Crell, Rosenblatt
& Johnston, LLP
Fort Wayne, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In Re the Adoption of H.J.S.

J.H.S. and P.L.S.,

*Appellants-Petitioners,*

v.

B.M.C. and A.J.S.,

*Appellees-Respondents*

March 31, 2015

Court of Appeals Case No.
76A04-1410-AD-502

Appeal from the Steuben Superior Court.
The Honorable William C. Fee, Judge.
Cause No. 76D01-1312-AD-8

**Baker, Judge.**

[1] J.H.S. (Paternal Grandfather) and P.L.S. (Paternal Grandmother) appeal the trial court's order dismissing their petition to adopt their grandchild, H.J.S. (Child). The trial court found that the Paternal Grandparents had thwarted the ability of B.C. (Mother) to communicate with Child for the year leading up to the filing of the adoption petition and that, consequently, Mother's consent to the adoption was required. The Grandparents argue that some of the trial court's findings are erroneous as a matter of law and that their petition should not have been dismissed. Finding that Mother's consent was not required, we reverse and remand for further proceedings.

## Facts

[2] Child was born on August 31, 2007, to Mother and Father.[1] Child has been living with Paternal Grandparents since December 31, 2009. On November 9, 2010, Paternal Grandparents filed a petition for temporary custody of Child so that they could enroll him in preschool. After Mother expressed hesitation regarding custody, the parties agreed to meet with a mediator.

[3] Following mediation, Mother and the Paternal Grandparents were able to reach an agreement (Mediation Agreement). The Mediation Agreement was filed with the trial court on February 8, 2011. In relevant part, the Mediation Agreement provides as follows:

---

[1] Father had not had contact with Child for at least a year prior to the filing of the adoption petition, so his consent to the adoption is not required and he is not participating in this appeal.

2. All parties agree that it is in [Child's] best interest that his Paternal Grandparents continue to exercise temporary physical custody of [Child] and to determine his best interests.

3. Furthermore, all parties agree that it is in [Child's] best interest that his Mother be offered an opportunity to normalize her parenting relationship with [Child] in the hopes that she may take up the duties of his primary care in the future.

4. To that end, all parties agree that as a first step . . . , that over approximately the next six (6) months . . . , Mother will [abide by] the following plan:

   1. Mother will have predictable and consistent visitation with [Child] on alternate weekends or at such times and places as she and Paternal Grandparents shall agree.

   2. Mother will provide a stable home for [Child] . . . .

   3. Mother will provide proof of completing a parenting class . . . .

   4. Mother will help to facilitate and to support visits between [Child] and his Maternal Grandmother . . . .

                              ***

5. All parties agree that the question of Mother's reasonable fulfillment and completion of the above first step, or any subsequent steps outlined below, will be at Paternal Grandparents' discretion, but contestable by Mother if she believes they are being unreasonable . . . , first through an appeal privately in mediation, but, if needed thereafter, to the Court.

                              ***

10. All parties agree that until such time as such a stipulation is provided to the Court, Paternal Grandparents will remain the temporary custodians of [Child] and will have the duty and responsibility to set the pace and exercise the discretion required in the above [sic] at each step to advance to the next step, with Mother's right to contest their judgment as outlined in paragraph five (5) above.

                              ***

13.     Finally, all parties agree that, should any future private efforts at conflict resolution not prove successful, they will return to mediation at the unilateral request of either Paternal Grandparents or Mother as their first step towards formal conflict resolution before filing any future petition with the court . . . .

Tr. Ex. 3. p. 7-12.  The Mediation Agreement goes on to outline several more steps to work through after completion of the above-described first step.  The trial court adopted the Mediation Agreement and awarded Paternal Grandparents temporary custody of Child on February 8, 2011.

[4]     Mother had not yet completed the first step of the Mediation Agreement as of the adoption hearing on August 6, 2014.  She had failed to complete a parenting class despite having over three years to do so.  She had failed to obtain stable housing, instead living in multiple states and cities with different boyfriends, at times actively concealing her location from Paternal Grandparents.

[5]     Mother did, however, exercise her parenting time rights for over a year.  In fact, as of March 2012, Mother was taking Child to the home of Maternal Grandmother for full weekend visitations.  At some point, Paternal Grandparents learned that two people living with Maternal Grandmother had been recently charged with multiple drug offenses.[2]  One of the probable cause affidavits specified that on April 12, 2012, there was marijuana, drug paraphernalia, methamphetamine, and a handgun in Maternal Grandmother's

---

[2] Both individuals ended up pleading guilty to possession of methamphetamine.

home. After learning of the drug issues in Maternal Grandmother's home, Paternal Grandparents no longer permitted Child to spend the night in that home because they feared for his safety. They still let Child visit that residence because Maternal Grandmother stated that those two individuals had moved out. At some point, however, Mother posted a picture on Facebook of one of the people convicted of drug offenses sleeping on a couch next to Child at Maternal Grandmother's home.

[6] After seeing that picture, Paternal Grandparents stated that parenting time would have to occur at a public location rather than in Maternal Grandmother's home. Mother selected a McDonald's for those visits. The first McDonald's visit was uneventful. At some point, Mother failed to show for one of the visits. On another occasion, Maternal Grandmother came with Mother to the visit and engaged Paternal Grandparents in a verbal altercation in front of the Child when they refused her request to have Child spend Christmas at her home.

[7] Paternal Grandparents believed that conflict and verbal altercations were not healthy for Child and concluded that it would be best for Child if they were no longer present for Mother's visits. Given the past problems, however, they were reluctant to permit the visits to occur in an unsupervised setting. On December 10, 2012, Paternal Grandparents sent Mother a letter stating that they planned to have her visits set up at an agency called Family Ties, which is able to supervise parenting time. They provided her with the agency's phone number and the name of the contact person to call to set up the visits. In the letter,

Paternal Grandparents also stated that Mother could take Child to her family's Christmas party on Christmas Eve.

[8]     Mother did not call Family Ties. Paternal Grandmother called Family Ties, and was mistakenly informed that a court order was needed for parenting time to take place at that facility. Neither Mother nor Paternal Grandmother followed up. Mother did not take Child to her family's Christmas party because "somethin' came up." Tr. p. 95. Mother's last visit with Child was at McDonald's on December 9, 2012.

[9]     Between December 10, 2012, and December 10, 2013, Mother called or texted Paternal Grandparents on two or three occasions. Paternal Grandparents did not respond. During that year, Mother never sought mediation pursuant to the Mediation Agreement, stopped by Paternal Grandparents' home, followed up with Family Ties, or pursued relief from the trial court.

[10]    On December 10, 2013, Paternal Grandparents filed a petition to adopt Child. On August 6, 2014, the trial court held an evidentiary hearing regarding the issue of Mother's consent. At the hearing, the director of Family Ties testified that a court order is not required for the facility to supervise parenting time. Tr. p. 78. On September 25, 2014, the trial court entered an order dismissing the petition because of a lack of consent from Mother. In relevant part, the trial court found and concluded as follows:

> 3.      [Mother] was granted unsupervised parenting time with the child pursuant to this Court's Order dated February 8, 2011

(ratifying [the Mediation Agreement]). The Order has not been modified.

*** 

5.     [Mother] communicated significantly in person with [Child] after September 4, 2012 through December 9, 2012 both at her residence and at McDonald's . . . .

*** 

8.     The Court's Order of February 8, 2011, regarding visitation does not call for any of Mother's visitation to be supervised nor does it specify that any visitation will be conducted at [Family Ties].

*** 

12.     [Mother's] uncontroverted testimony is she tried contacting the [Paternal Grandparents] by cell phone after December 9, 2012 and into the early part of 2013 to visit with [Child] but her phone calls and text messages went unanswered.

*** 

14.     As of December 10, 2012, the [Paternal Grandparents] have negated efforts on [Mother's] behalf to communicate significantly/exercise visitation with [Child] by:

- Refusing to answer or return phone calls from [Mother] regarding visitation;
- Refusing to meet at a mutually acceptable place for visitations . . . ; and
- Mandating that any visitation between [Mother] and [Child] after December 9, 2012, be supervised at [Family Ties] despite uncontroverted testimony that this facility required a court order to facilitate such visitation.

*** 

20.     The [Paternal Grandparents], in refusing to answer [Mother's] phone calls and text messages, and in mandating supervised visitation when the Court had not required such, have hampered and/or thwarted significant communication from occurring between [Mother] and [Child].

21.     Based upon the foregoing, the Court FINDS that the [Paternal Grandparents] have failed to meet their burden of proof, by clear and convincing evidence, that for a period of at least one year since [December] 9, 2012, [Mother] has failed without justifiable cause to communicate significantly with [Child] when able to do so.

Appellant's App. p. 7-12.  Paternal Grandparents now appeal.

# Discussion and Decision

[11]     Our Supreme Court has recently clarified the standard of review to be applied to adoption proceedings:

> "When reviewing the trial court's ruling in an adoption proceeding, we will not disturb that ruling unless the evidence leads to but one conclusion and the trial judge reached an opposite conclusion." *Rust v. Lawson,* 714 N.E.2d 769, 771 (Ind. Ct. App. 1999).  We presume the trial court's decision is correct, and we consider the evidence in the light most favorable to the decision.  *Id.* at 771–72.
>
> When, as in this case, the trial court has made findings of fact and conclusions of law, we apply a two-tiered standard of review: "we must first determine whether the evidence supports the findings and second, whether the findings support the judgment." *In re Adoption of T.W.,* 859 N.E.2d 1215, 1217 (Ind. Ct. App. 2006); *see also* Ind. Trial Rule 52(A) (providing that where the trial court has made findings of fact and conclusions of law, "the court on appeal shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.").  Factual findings "are clearly erroneous if the record lacks any evidence or reasonable inferences to support them [and] . . . a judgment is clearly erroneous when it is unsupported by the findings of fact and the conclusions relying on those findings." *T.W.,* 859 N.E.2d at 1217.

*In re Adoption of T.L.*, 4 N.E.3d 658, 662 (Ind. 2014).

[12]     As a general rule, a petition to adopt a child under the age of eighteen will be granted only if written consent to the adoption has been executed by the child's parents. Ind. Code § 31-19-9-1(a). Indiana Code section 31-19-9-8, however, sets forth an exception to the general rule:

> (a)     Consent to adoption, which may be required under section 1 of this chapter, is not required from any of the following:
>
>                                         ***
>
> (2)     A parent of a child in the custody of another person if for a period of at least one (1) year the parent:
>
> > (A)     fails without justifiable cause to communicate significantly with the child when able to do so[.]

In seeking an adoption without consent from the parents, the petitioner must meet the burden of proof by clear and convincing evidence. *In re Adoption of S.W.*, 979 N.E.2d 633, 640 (Ind. Ct. App. 2012).

[13]     This Court has discussed the evidence that is required to satisfy the above statutory exception to the general consent rule:

> Initially, we note that a party petitioning to adopt without parental consent has the burden of proving both a lack of communication for the statutory period and that the ability to communicate during that time period existed. Whether this burden has been met is necessarily dependent upon the facts and circumstances of each particular case, including, for example, the custodial parent's willingness to permit visitation as well as the natural parent's financial and physical means to accomplish his obligations. *Efforts of a custodial parent to hamper or thwart communication between parent and child are relevant in determining the ability to communicate. However, in order to preserve the consent requirement for adoption, the level of communication with the child must be significant, and also must be more than "token efforts" on the part of the parent to communicate with the child.* The reasonable intent of the statute is to encourage non-custodial parents to maintain communication with

their children and to discourage non-custodial parents from visiting their children just often enough to thwart the adoptive parents' efforts to provide a settled environment for the children.

*In re Adoption of C.E.N.*, 847 N.E.2d 267, 271-72 (Ind. Ct. App. 2006) (internal citations omitted) (emphasis added).

[14] In this case, the trial court based its conclusion regarding Mother's consent on three basic findings of fact: (1) that Paternal Grandparents required that Mother's visits be supervised, ostensibly in violation of the Mediation Agreement; (2) that Paternal Grandparents required that Mother's visits take place at a facility that ostensibly required a court order to supervise parenting time; and (3) that Paternal Grandparents failed to return Mother's two or three phone calls and texts. We will consider each of these in turn.

[15] First, the trial court found that the Mediation Agreement granted Mother unsupervised parenting time. Appellant's App. p. 7-8. This is incorrect. The Mediation Agreement does not specify whether Mother's parenting time was to be supervised or unsupervised. Instead, it says that it was up to Paternal Grandparents to determine what was in Child's best interests and that visitation, as well as Mother's compliance with the terms of the Mediation Agreement, was within the discretion of Paternal Grandparents. Tr. Ex. 3 p. 8-9. Mother had the right to seek redress from a mediator and/or the trial court if she believed that Paternal Grandparents were abusing their discretion.

[16] Second, the trial court found that the Mediation Agreement does not specify that visits were to take place at Family Ties. While this is technically correct, as

noted above, the agreement *does* state that visits were within the discretion of Paternal Grandparents. The trial court also found that there was "uncontroverted testimony that [Family Ties] required a court order to facilitate such visitation." Appellant's App. p. 9. This is incorrect, inasmuch as the director of Family Ties testified at the hearing that a court order is *not* required to facilitate parenting time. Tr. p. 78-79. She testified that it was "possible, but unlikely," that a Family Ties employee had mistakenly informed Maternal Grandmother that a court order was required, but it is undisputed that, in fact, no court order is required. *Id.* at 79.

[17] Third, the trial court found that Paternal Grandparents failed to answer or return Mother's phone calls or texts. This is correct, but must be considered in context. Between February 2011 and December 2012, Paternal Grandparents made every effort to enable Mother and Child to see each other. They allowed overnight visits at Maternal Grandmother's home, until residents of that home were convicted of possessing drugs inside that residence. They still allowed Child to visit the home during the day, until they learned that one of the convicted drug offenders was still maintaining a presence in that home. Paternal Grandparents then asked that Mother's visits take place at a public location, which they let her select. And after Maternal Grandmother initiated a verbal altercation at one of those visits, in front of the Child, Paternal Grandparents determined that it was in Child's best interests that they no longer be present at the visits. But given the unstable history of those visits and of Mother's living situation, Paternal Grandparents asked that the visits be

supervised. Of their own initiative, they found an agency that would help, and informed Mother of the name, phone number, and contact person for that agency. Paternal Grandparents also told Mother that Child could join her for her family's Christmas party.

[18] Notwithstanding all of these efforts, Mother did not call Family Ties, nor did she follow up when Maternal Grandmother reported that a court order was required. Mother did not take Child to her family Christmas party. Mother called and texted Paternal Grandparents two or three times between December 2012 and the beginning of 2013, but quickly gave up after she received no response.

[19] Mother had the right, under the Mediation Agreement, to seek mediation on the issue of her parenting time. She did not. She also did not seek redress from the trial court. Mother worked just blocks from the home of Paternal Grandparents and Child, but she never went there in person. Mother had previously visited the workplace of Paternal Grandparents, but never once went there in person during the year leading up to the filing of the adoption petition. Mother never sent cards or letters to Child during that year.

[20] To determine whether Mother's consent is required, the trial court need examine only the year prior to the filing of the petition. I.C. § 31-19-9-8(a)(2). In that year, Mother made two or three phone calls, and made no further efforts to see Child. As noted above, more than "token efforts" on the part of the parent to communicate with the child are required to retain the right to consent

to an adoption. *C.E.N.*, 847 N.E.2d at 271-72. Mother's two or three phone calls and text messages, over the course of an entire year, amount to only token efforts to communicate with Child. And Paternal Grandparents' failure to return those few calls does not amount to an attempt to thwart that communication.

We find that the evidence in this case leads to but one conclusion—that, in the year prior to the filing of the adoption petition, Mother failed without justifiable cause to communicate with Child despite having the opportunity to do so. Consequently, her consent to the adoption was not required and it was erroneous to dismiss the adoption petition.

The judgment of the trial court is reversed and remanded for further proceedings consistent with this opinion.

Najam, J., and Friedlander, J., concur.