847 N.E.2d 267 (2006)
In re The Matter of ADOPTION OF C.E.N.
Andrea Saulmon Appellant-Respondent,
v.
Alfred and Lucy Stamper, Appellee-Petitioner.
No. 06A04-0601-CV-71.
Court of Appeals of Indiana.
May 19, 2006.
*268 Michael D. Gross, Lebanon, for Appellant.
Deborah K. Smith, Thorntown, for Appellee.

OPINION
RILEY, Judge.

STATEMENT OF THE CASE
Appellant-Respondent, Andrea Saulmon (Saulmon), appeals the trial court's grant of a Petition for Adoption of C.E.N., Saulmon's minor child, filed by Appellees-Petitioners, Alfred Stamper (Alfred) and Lucy Stamper (Lucy) (collectively, the Stampers).
We affirm.

ISSUE
Saulmon raises one issue on appeal, which we restate as: Whether the trial court properly granted the Stampers' Petition for Adoption of C.E.N.

FACTS AND PROCEDURAL HISTORY
Saulmon was fifteen years old when she gave birth to C.E.N. on August 2, 2000. Thereafter, it was established that Nicholas Nease (Nease), Lucy's son, is C.E.N.'s *269 biological father. In October of 2001, Lucy, C.E.N.'s paternal grandmother, was granted custody of C.E.N. On November 12, 2004, the Stampers filed a Petition for Adoption of C.E.N., along with a Consent by Nease. On April 8, 2005, Saulmon filed a Motion to Contest Adoption and Natural Mother's Request for Court Appointed Counsel. In addition, on April 14, 2005, an Application for Pauper Counsel was filed on behalf of Saulmon. On April 19, 2005, the trial court appointed counsel for Saulmon.
On August 11, 2005, the trial court held a hearing on the Stampers' Petition for Adoption. On October 31, 2005, the trial court entered its Findings of Fact and Conclusions of Law, stating in pertinent part:

FINDINGS OF FACT:
1. That [the Stampers] are the paternal grandparents and legal custodians of the minor child, C.E.N. . . .
2. That [C.E.N.] is a male child born in Marion County, State of Indiana on August 2, 2000 and he has been in the care and custody of [the Stampers] since January 2001. [C.E.N.] has been in the care of [the Stampers] since he was approximately eight months old and was formally placed there by the [c]ourt on October 15, 2001 . . .
3. That the petitioner, [Alfred,] is age 35 . . . He is employed on a full-time basis and has sufficient income to rear and support [C.E.N.].
4. That the petitioner, [Lucy,] is 40 years of age . . . She is a homemaker and receives social security disability.
* * *
6. That the natural father of [C.E.N.] is [Nease] and he has consented to the adoption . . .
7. . . . [Saulmon] acknowledges that she is not in a position to have custody of the minor child; however, she does not consent to the adoption of [C.E.N.] by the [Stampers].
8. That the [Stampers] have a sufficient means to support [C.E.N.] if the adoption is granted and have been supporting [C.E.N.] since January 2001.
* * *
10. That consent to adoption is not required by a natural parent if, for a period of at least one year, the parent fails, without justifiable cause to communicate significantly with the child when able to do so, or, knowingly fails to provide for the care and support of the minor child when able to do [so] as required by law or judicial decree.
11. That if either of the two criteria, communication or financial support, is not met then consent is not required.
12. That token efforts to support or communicate with the child are not sufficient.
13. That [Saulmon] acknowledges that in July 2001, she was working 35-40 hours a week and that when working at Wendy's, she often times worked in excess of 40 hours [per week]. She indicates that her work schedule interfered with her ability to visit.
14. That [Saulmon] acknowledges that during this same time period, from October 2001 until November 2004[] her total financial contribution was no more than One Hundred and Twenty Five Dollars, ($125.00). She estimates that she spent $50.00 on clothing; $20.00 on a winter jacket; $5.00 for socks and $50.00 for eating out. She admits that she provided no cash to [the Stampers] for use as support. Recent payments for support were made after the Petition for Adoption was filed and as a result of a *270 IV-D action to collect child support from [Saulmon].
15. That [Saulmon] has worked at Wendy's, Kentucky Fried Chicken, and Applebee's and has drawn unemployment. She was employed by Wendy's from December 2001 until February 2004. She has lived on her own as well as at her mother's home. During these extended periods of employment, she has offered no support.
16. That the amount of communication [Saulmon] has had with the minor child is disputed. [Lucy] testified that [Saulmon's] contact has been sporadic and that there have been times when [Saulmon] would come to her home and stay outside in the vehicle rather than come inside and visit [C.E.N.].
17. [Lucy] indicated on one occasion the [parties] lived close to each other, in the same apartment complex, and that their contact was limited only to the coincidental contact due to the proximity of their residences.
18. [Lucy] indicated that [C.E.N.] had surgery and that [Saulmon] neither participated in the care of [C.E.N.] or even inquired as to his recovery.
19. [C.E.N.] had been in home-based therapy due to emotional issues and, although [Saulmon] went to the initial appointment for therapy, she did not follow [up] with the in[-]home visits that took place in [Lucy's home] with the therapist.
20. [Saulmon] had taken [Lucy] to [c]ourt on November 13, [2003] requesting custody of [C.E.N.]. At the conclusion of the hearing, the [c]ourt determined [Saulmon's] action was frivolous and ordered [Saulmon] to assist in [Lucy's] attorney's fees.
21. At that hearing, [Lucy] had advised [Saulmon] that she was not going to push [Saulmon] any [more] to visit and that she was advising [Saulmon] in open court that adoption was an avenue she would pursue if [Saulmon] did not start actively visiting.
22. After [c]ourt in November 2003, there was a brief visit at Christmas of about ten minutes. In August of 2004, [Lucy] was in [c]ourt with [Saulmon] regarding the support issue and [Lucy] offered to take [Saulmon] to her home to visit [C.E.N.] and she declined.
23. [Saulmon] testified that sometimes she was unable to visit due to her work schedule and the number of hours she was working.
24. [Saulmon] further testified that, at times, she did not believe [Lucy] encouraged the visitation between she and [C.E.N.]. [Saulmon] stated that she had been told "no" before when she wanted to visit and that she quit calling at one point because she did not believe she would be allowed to visit.
25. [Saulmon] also disputed the amount of contact she had with [C.E.N.]. She indicated that she took off school for a week once to take care of him in [Lucy's] home after a tonsil surgery.
26. [Saulmon] admits that she is not in a position to provide custody of [C.E.N.].
CONCLUSIONS OF LAW:
* * *
1. That [the Stampers are] fit and proper persons to adopt the minor child, namely [C.E.N.].
2. That the adoption by [the Stampers] of [C.E.N.] is hereby granted . . .
* * *
5. That consent of natural mother, [Saulmon,] is not required in that pursuant to [I.C. § 31-19-9-8], [Saulmon] has failed without justifiable cause to provide *271 for the care and support of the child when she was able to do so as required by law [or] judicial decree.
* * *
8. Further, the [c]ourt finds that during the one-year period prior to the filing of the Petition for Adoption, [Saulmon] failed to communicate significantly with [C.E.N.] without justifiable cause.
(Appellant's App. pp. 5-10).
Saulmon now appeals. Additional facts will be provided as necessary.

DISCUSSION AND DECISION
Saulmon argues that the evidence was insufficient to show that her consent to the adoption of C.E.N. was not required. Specifically, Saulmon asserts that the Stampers failed to present clear and convincing evidence that she failed to communicate significantly with C.E.N. or knowingly failed to provide care and support for him.
When reviewing the trial court's ruling in an adoption proceeding, we will not disturb that ruling unless the evidence leads to but one conclusion, and the trial court reached the opposite conclusion. Rust v. Lawson, 714 N.E.2d 769, 771 (Ind. Ct.App.1999), trans. denied. We will not reweigh the evidence, but instead will examine the evidence most favorable to the trial court's decision together with reasonable inferences drawn therefrom, to determine whether sufficient evidence exists to sustain the decision. Id. We note that a petition for adoption without parental consent bears the burden of proving the statutory criteria for dispensing with such consent in I.C. § 31-19-9-8(a)(2) by clear, cogent and indubitable evidence. Id. If the evidence most favorable to the judgment clearly, cogently, and indubitably establishes one of the criteria for granting adoption without parental consent, we will affirm the judgment. Id. Finally, the decision of the trial court is presumed to be correct, and it is the appellant's burden to overcome that presumption. Id. at 772.
Indiana Code § 31-19-9-1 provides, in pertinent part, that a petition to adopt a child who is less than eighteen (18) years of age may be granted only if written consent to the adoption has been executed by the mother of a child born out of wedlock and the father of a child whose paternity has been established. However, I.C. § 31-19-9-8(a)(2) states, in relevant part, that the consent required under section 1 of this chapter is not required from:
(2) A parent of a child in the custody of another person if for a period of at least one (1) year the parent:
(A) fails without justifiable cause to communicate significantly with the child when able to do so; or
(B) knowingly fails to provide for the care and support of the child when able to do so as required by law or judicial decree.
Here, Saulmon first disputes the trial court's conclusion that she failed, without justifiable cause, to communicate significantly with C.E.N. when able to do so. Specifically, Saulmon contends that Lucy thwarted her efforts to communicate with C.E.N. by refusing to take her telephone calls and by denying her requests to visit C.E.N. Initially, we note that a party petitioning to adopt without parental consent has the burden of proving both a lack of communication for the statutory period and that the ability to communicate during that time period existed. Rust, 714 N.E.2d at 772. Whether this burden has been met is necessarily dependent upon the facts and circumstances of each particular case, including, for example, the custodial parent's willingness to permit visitation as well as the natural parent's financial and physical means to accomplish *272 his obligations. Id. Efforts of a custodial parent to hamper or thwart communication between parent and child are relevant in determining the ability to communicate. Id. However, in order to preserve the consent requirement for adoption, the level of communication with the child must be significant, and also must be more than "token efforts" on the part of the parent to communicate with the child. I.C. § 31-19-9-8; Rust, 714 N.E.2d at 772. The reasonable intent of the statute is to encourage non-custodial parents to maintain communication with their children and to discourage non-custodial parents from visiting their children just often enough to thwart the adoptive parents' efforts to provide a settled environment for the children. Rust, 714 N.E.2d at 772.
In the instant case, the record indicates that C.E.N., now nearly six years old, has been in the care and custody of the Stampers since he was eight months old. In addition, the evidence most favorable to the trial court's decision reveals that Saulmon's communication and visitation with C.E.N. has been sporadic over the last few years, and has been no longer than ten to fifteen minutes at a time. Also, our review of the record shows that although Lucy eventually became discouraged by Saulmon's lack of interest in visiting C.E.N., she initially encouraged visitation between Saulmon and C.E.N. At the adoption hearing, the following colloquy took place:
[APPELLEES' TRIAL COUNSEL]:. . . In the past four years, to the extent that visitation has occurred, who has been the person that's been primarily behind encouraging the visits?
[LUCY]: [Me], Lucy.
[APPELLEES' TRIAL COUNSEL]: And why did you do that . . .?
[LUCY]: [I] was just trying to get [Saulmon] to get a bond with [C.E.N.] so, you know, to connect and be a mother. I just wanted [Saulmon] to, you know, [I] just wanted her to be part of [C.E.N.'s] life. I just gave up [after November of 2003] because it just wasn't happening.
(Transcript pp. 38-39). Therefore, we disagree with Saulmon's contention that Lucy hampered her communication with C.E.N.
Furthermore, our review of the record discloses that Saulmon has not visited with C.E.N. since July of 2004, and even that particular visit was not pre-arranged; rather, on that occasion, Saulmon unexpectedly saw C.E.N. during a visit to Saulmon's mother's house. Moreover, up until that time, the record evidences that Saulmon lived within a very close distance to C.E.N., and thus was able to visit C.E.N. when she chose to. Accordingly, we find sufficient evidence in the record to support the trial court's conclusion that Saulmon failed without justifiable cause to communicate significantly with C.E.N. when she was able to do so. Because under I.C. § 31-19-9-8(a)(2), parental consent is not required if only one of the two criteria is met, we decline to address Saulmon's argument that the evidence was insufficient to show she knowingly failed to provide care and support for C.E.N.

CONCLUSION
Based on the foregoing, we conclude that the trial court properly granted the Stampers' Petition for Adoption of C.E.N.
Affirmed.
VAIDIK, J., and DARDEN, J., concur.