## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



ATTORNEY FOR APPELLANT

R. Patrick Magrath
Alcorn Sage Schwartz & Magrath, LLP
Madison, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Adoption of M.H.; | October 8, 2015 |
| D.M., | Court of Appeals Case No. 39A05-1503-AD-87 |
| *Appellant/Respondent,* | Appeal from the Jefferson Circuit Court |
| v. | The Honorable William E. Vance, Senior Judge |
| B.H., | Trial Court Cause No. 39C01-1308-AD-14 |
| *Appellee/Petitioner.* | |

**Pyle, Judge.**

## Statement of the Case

Appellant/Respondent, D.M. ("Father"), appeals the trial court's order granting Appellee/Petitioner, B.H.'s ("Maternal Grandmother"), petition to

adopt his minor daughter, M.H.  In an adoption hearing, the trial court held that Father's consent was not required for the adoption because Father had failed to communicate significantly with M.H. for more than a year and had failed to pay child support for her for more than a year.  On appeal, Father argues that the trial court erred and his consent was required because:  (1) there was no evidence to support the trial court's findings of fact; (2) the trial court inappropriately shifted the burden of proof to Father; and (3) the trial court's findings of fact did not support its conclusions of law that Father had failed to communicate significantly with M.H. or pay her child support for more than a year.  Because we conclude that there was evidence to support the trial court's findings of fact, it did not inappropriately shift the burden of proof, and its findings of fact did support its conclusions, we affirm.

We affirm.

## Issue

> Whether Father's consent was required for Maternal Grandmother to adopt Father's minor daughter, M.H.

## Facts

[2] T.H. ("Mother") and Father had one child together, M.H., who was born in June 2008.  After M.H.'s birth, she and Mother lived with Maternal Grandmother.  Father did not sign M.H.'s birth certificate.  However, Mother later established his paternity, and, on January 1, 2009, the trial court ordered him to pay child support in the amount of $30 per week.  Father was not working during M.H.'s first year of life, so he only paid support "sometime[s]."

(Tr. 12). In total, between January 23, 2009 and May 17, 2013, he paid $181.90.

[3] Prior to M.H.'s birth, Father had served a sentence in the Indiana Department of Correction from July 19, 2006 to July 4, 2007, for a dealing in cocaine conviction. In October 2009, he was then charged with conspiracy to deal cocaine based on events that had occurred in June 2008, the same month that M.H. was born. He was convicted of the charge, and the trial court sentenced him to nine (9) years, plus an additional three (3) years for violating his probation in his earlier dealing in cocaine conviction.[1] As a result, Father was incarcerated from October 2009 until October 7, 2014. During this time, he did not pay any child support for M.H. He later testified that he did not know he could petition the court for an abatement of his child support while he was incarcerated.

[4] During Father's incarceration, M.H. lived with Maternal Grandmother. Mother also lived with Maternal Grandmother for the first four years of M.H.'s life, but she then moved out when M.H. was four years old and left her in Maternal Grandmother's care. Father did not make any attempts to communicate with M.H. at Maternal Grandmother's house during his incarceration. However, Maternal Grandmother allowed Father's mother ("Paternal Grandmother") and step-father ("Paternal Step-Grandfather")

---

[1] Father's judgments of conviction and sentencing orders are not a part of the record. Accordingly, these facts regarding his convictions and sentences are based on his testimony at the hearing.

(collectively, "Paternal Grandparents") to visit with M.H. every third weekend of the month, and M.H. would talk to Father at Paternal Grandparents' house "if she was there when he called." (Tr. 130).

[5] In May 2013, with Mother's and Father's consent, Maternal Grandmother established a guardianship of M.H. While Father was in the court for the guardianship hearing, he asked Maternal Grandmother if she would transport M.H. to his prison to visit with him. Maternal Grandmother and the Department of Child Services (DCS) objected to this request on the basis that M.H. did not really know Father and that it was inappropriate for a child to visit a prison. DCS told Maternal Grandmother not to take M.H. to the prison and also told Maternal Grandmother not to allow Paternal Grandparents visitation if they were going to take M.H. to the prison.

[6] Shortly thereafter, on August 21, 2013, Maternal Grandmother filed a petition to adopt M.H. and to terminate Mother's and Father's parental rights. Mother consented to the adoption, but Father did not. The matter was originally set for a hearing on September 10, 2013, but Father entered his objection to the adoption on that date, and the adoption court appointed counsel to represent him. On May 9, 2014, Father filed notice of his intent to contest the adoption.

[7] In the meantime, on March 9, 2014, M.H. returned home from a visit with Paternal Grandparents with her cheekbone "all swollen, black and blue" and a puncture mark on the top of her forehead. (Tr. 74). Maternal Grandmother tried to reach Paternal Step-Grandfather over the next three days to find out

what had happened, but he did not respond. Later, she discovered that a dog had bitten M.H. while she was at the Paternal Grandparents' house. Subsequently, she did not allow Paternal Grandparents to have visitation with M.H.[2]

[8] Father was released from prison on October 7, 2014. At the time of his release, he had only $50 to $60 in his bank account. Debbie Lohrig ("Lohrig"), with the Child Support Administration of the Prosecutor's Office, calculated that the child support he owed Mother for the period of time before Maternal Grandmother's guardianship was in arrearage of $6,628.10. She also calculated that Father owed Maternal Grandmother $660 for child support that had accrued since she had become M.H.'s guardian.

[9] After his release, Father lived with his biological father and got a job doing construction for a week, which paid eight dollars an hour, then got a job at Pizza Hut. On November 26, 2014, a wage withholding order went into effect to garnish current and arrearage child support in the amount of $35 per check from Father's Pizza Hut wages. As of the time of the hearing, child support had been withheld on three of the checks. However, Father did not pay any child support from his earnings at his construction job.

---

[2] Maternal Grandmother also testified that Paternal Grandparents did not make any attempts to re-establish visitation after that incident.

[10] One night that fall, when Father was walking from Pizza Hut, he saw Maternal Grandmother and six-year-old M.H. and "hollered" at M.H., saying "Hey, baby girl. How are you doing?" (Tr. 69). M.H. got behind Maternal Grandmother and then got into Maternal Grandmother's car. When they were both inside, Maternal Grandmother asked, "M.H., who was that?" and she responded "I don't know, Memmaw." (Tr. 70). Maternal Grandmother responded, "Well, you know what I said about talking to strangers," and M.H. said, "Yeah, that's why I got behind you." (Tr. 70). Maternal Grandmother did not tell M.H. that the person she had seen in the parking lot was Father. Father later testified that, because Maternal Grandmother did not let him see M.H. during this incident, he did not attempt to contact Maternal Grandmother for visitation after his release from prison.

[11] On December 29, 2014, the trial court held a hearing on Maternal Grandmother's petition to adopt M.H. and to terminate Father's parental rights. At trial, Father said that he had communicated with M.H. on the phone from prison "numerous times" when she had been at Paternal Grandparents' house. (Tr. 27). He also said that he had sent her one birthday card at Maternal Grandmother's house and that he had arranged for Angel Tree to send Christmas presents for her at Paternal Grandparents' house. However, both of these events occurred after Maternal Grandmother filed her petition for adoption.

[12] Paternal Step-Grandfather testified that he had previously taken M.H. to the prison to see Father when she stayed with Paternal Grandparents and that

Father had communicated with M.H. through "[p]hone calls, letters, or visitation." (Tr. 120). When he was asked whether it was possible he had gotten confused and that it was Father's other daughter he had taken to visit Father in prison, though, Paternal Step-Grandfather said, "Well, we . . . we . . . we took both, but uh . . . because M.H. wasn't on the uh . . . list she didn't get to see her father, but we did take her down there." (Tr. 120).

[13] Next, Paternal Grandmother testified that Father had attempted to communicate with M.H. "if she was there when he called." (Tr. 130). She also mentioned that Father had arranged for Angel Tree to send M.H. Christmas presents the previous year.

[14] At the conclusion of the trial, the trial court entered findings of fact and conclusions thereon, concluding that Father's consent was not required for Maternal Grandmother's adoption because he had failed to communicate significantly with M.H. and to pay child support for her for more than a year. The trial court also granted Maternal Grandmother's petition for adoption. Father now appeals. Additional facts will be provided as necessary.

# Decision

[15] On appeal, Father challenges the trial court's conclusion that his consent was not required for the adoption. Specifically, he argues that the trial court erred and that his consent was required because: (1) there was no evidence to support the trial court's findings of fact; (2) the trial court inappropriately shifted the

burden of proof to him instead of Maternal Grandmother; and (3) the trial court's findings of fact do not support its conclusions of law.

[16] Generally, a petition to adopt a minor child born out of wedlock may be granted only if written consent to the adoption has been provided by "the mother . . . and the father of a child whose paternity has been established by: (A) a court proceeding other than the adoption proceeding, except as provided in [INDIANA CODE §] 31-14-20-2; or (B) a paternity affidavit executed under [INDIANA CODE §] 16-37-2-2.1[.]" I.C. § 31-19-9-1(a)(2). However, there are a number of exceptions to the consent requirement. *See* I.C. § 31-19-9-8. As is relevant here, consent is not required from a "parent of a child in the custody of another person if for a period of at least one (1) year the parent: (A) fails without justifiable cause to communicate significantly with the child when able to do so[.]" I.C. § 31-19-9-8(a)(2)(A). If an adoption petition alleges that a parent's consent is unnecessary under INDIANA CODE § 31-19-9-8(a)(2) and that parent files a motion to contest, "'a petitioner for adoption has the burden of proving that the parent's consent to the adoption is unnecessary' by clear and convincing evidence." *D.D. v. D.P.*, 8 N.E.3d 217, 220-21 (Ind. Ct. App. 2014) (quoting I.C. § 31-19-10-1.2).

[17] Where, as here, a trial court enters findings of fact and conclusions of law, this Court determines, first, whether the evidence supports the findings and, second, whether the findings support the judgment. *Id.* at 220. We will set aside the trial court's findings of fact and conclusions of law only if they are clearly erroneous, or, in other words, the record contains no facts or inferences to

support them. *Id.* The trial court's judgment is clearly erroneous when "'it is unsupported by the findings of fact and conclusions of law relying on those findings.'" *Id.* (quoting *In re Adoption of T.L.*, 4 N.E.3d 658, 662 (Ind. 2014)). In making this determination, we will neither reweigh the evidence nor judge the credibility of witnesses. *In re Paternity of M.F.*, 938 N.E.2d 1256, 1258 (Ind. Ct. App. 2010), *reh'g denied*, *trans. denied.*

[18] Maternal Grandmother did not file an Appellee's Brief. Where the appellee fails to file a brief, we will not undertake the burden of developing arguments for the appellee. *In re Adoption of N.W.R.*, 971 N.E.2d 110, 112 (Ind. Ct. App. 2012). We apply a less stringent standard of review and may reverse the trial court if the appellant establishes prima facie error. *Id.* at 113. Prima facie is defined as "at first sight, on first appearance, or on the face of it." *Id.*

[19] Father's first argument is that the trial court erred because there was no evidence to support two of its findings of fact. Specifically, the trial court found that "[Father] ha[d] only seen [M.H.] on two or three occasions since her birth," (App. 22), and that:

> 57. Three witnesses testified on behalf of [Father:] his mother, his father, and himself.

> 58. They gave conflicting testimony as to the amount and type of contact [Father] is alleged to have had with [M.H.] when she was visiting his parents.

(App. 23). Father claims that these findings were erroneous because: (1) he had testified that Mother and M.H. stayed with him at his home prior to his October 2009 incarceration and, thus, he saw her more than two or three times; and (2) his witnesses had not given conflicting testimony because they had all testified that he had spoken with M.H. "numerous" times on the phone when M.H. was visiting Father's parents. (Father's Br. 12).

[20] However, Father's arguments are a request to reweigh the evidence, which we will not do. *Paternity of M.F.*, 938 N.E.2d at 1258. In spite of Father's contentions, there was evidence to support the trial court's findings. As for Father's first argument, even though Father testified that Mother and M.H. had stayed with him prior to his incarceration, Maternal Grandmother disagreed and testified that Father had "seen M.H. maybe three times tops when she was a baby." (Tr. 89). It is not our place to reweigh or question the trial court's determination of her credibility. *Paternity of M.F.*, 938 N.E.2d at 1258.

[21] There was also evidence that Father's witnesses had conflicting testimony. Paternal Step-Grandfather testified that he had previously taken M.H. to the prison to see Father when she stayed with Paternal Grandparents and that Father had communicated with M.H. through "[p]hone calls, letters, or visitation." (Tr. 120). However, when he was asked whether it was possible he had gotten confused, he retracted his statement and said that he had taken M.H. to the prison but she had not seen Father. Then, when Paternal Grandmother was asked whether Father had communicated with M.H., she mentioned only that Father had talked to M.H. on the phone. She never

testified that Father had attempted to communicate with M.H. through letters or visitation, even when she was asked whether Father had ever sent M.H. anything such as "gifts and cards." (Tr. 130). These inconsistencies support the trial court's finding that Father's witnesses had conflicting testimony.

[22] Next, Father argues that the trial court inappropriately shifted the burden of proof to him on the issue of his communication with M.H. As we stated above, "'a petitioner for adoption has the burden of proving that the parent's consent to the adoption is unnecessary' by clear and convincing evidence." *D.D.*, 8 N.E.3d at 220-21 (quoting I.C. § 31-19-10-1.2). Father points to the trial court's following conclusions of law to support his argument:

> 6. The party bearing the burden of proof in an adoption proceeding must prove their case by clear and convincing evidence. [I.C. §] 31-19-10-0.5.

> 7. [Father] presented very little testimony that the best interests of [M.H.] were better served by the adoption being denied. He established that he was the biological parent, that he had some limited contact with the child in her infancy, that he wanted "his rights" to have parenting time, that he was now out of prison, that he had held a job for a few weeks and paid minimal child support, that he believed he could care for her, and that he felt he had "learned his lesson" and would not be returning to prison.

> 8. [Father] presented no evidence as to why he had not supported his child when he was not incarcerated or why he had not kept in contact [with] her when not incarcerated or even while incarcerated through, at minimum, letters or phone calls. [Father] admitted to his history of criminal convictions including those for domestic violence, violent crimes, and drug related

charges. Finally, [Father] admitted he did not want custody of [M.H.] but wanted only parenting time at this time, thus showing that he wanted limited responsibility for the care of the child. Rather than focusing on the best interests of [M.H.], [Father] seems to focus on the benefits he wants without also assuming any responsibilities.

9. [Father] fails to establish by clear and convincing evidence that it is in the best interest of [M.H.] for her to be denied the opportunity to be adopted by the only "mother" figure she has known and into the family unit she has known.

(App. 27-28). Father asserts that, while, as findings of fact, paragraphs seven and eight "could be construed as mere discretionary assessment of the factual record[,]" as conclusions of law they are "bookended by two statements regarding the burden of proof" and thus openly apply the clear and convincing standard to his evidence. (Father's Br. 9).

We disagree. While the trial court discussed the evidence Father "presented" and then applied the "clear and convincing evidence" standard to the evidence, the trial court used similar language in its conclusions regarding Maternal Grandmother. (App. 27-28). Specifically, it concluded:

10. [Maternal Grandmother], by contrast, established that she has been the adult who has cared for [M.H.] physically, emotionally, and financially, since her birth. She presented evidence that meets all of the factors for consideration in determining the best interests of a child and for satisfying the requirements for a de facto custodian since [M.H.'s] birth.

11. [Maternal Grandmother], through testimony of family members, friends and third parties including the case manager from Indiana Department of Child Services established that her home provided a loving, safe, secure environment for [M.H.] and that [M.H.] was bonded with her siblings in the home as well as with [Maternal Grandmother] and extended family.

12. [Maternal Grandmother] established through testimony of the representative of the Prosecutor's Office Child Support Division, that [Father] had not met his financial obligation to his child even when not incarcerated.

\* \* \*

15. . . . [T]here is no justifiable cause why [Father] could not have communicated with his child both when he was not in prison or even through written communication or phone calls while in prison. He has further failed to communicate with her in any fashion other than yelling at her across a parking lot since his release from prison in October of 2014.

16. [Maternal Grandmother] has established by clear and convincing evidence sufficient to defeat a contest to this adoption, that it is in M.H.'s best interest that this adoption be allowed to proceed.

17. Further, the evidence presented at the hearing in this matter also establishes that under [the] Indiana Code[,] [Father's] consent [] is not necessary.

(App. 28-29). Based on the similarity of the language that the trial court used in these conclusions—using words such as "established" and referring to the "clear and convincing" standard—it is clear that in paragraphs seven and eight the trial court was merely reviewing the evidence that Father had presented,

and in paragraphs ten, eleven, and twelve, it was reviewing the evidence that Maternal Grandmother had presented. Notably, the trial court also applied the clear and convincing standard to Maternal Grandmother's evidence in paragraph sixteen and said that she had met her burden of proof.

[25] Further, in paragraph nine, it is clear that the trial court was applying the clear and convincing standard within the context of M.H.'s best interests. While M.H.'s best interests were relevant to deciding Maternal Grandmother's adoption petition, they were not relevant to the issue of whether Father's consent to the adoption was required. *See* I.C. § 31-19-9-8 (specifying that a parent's consent to an adoption is not required if the parent "has failed without justifiable cause to communicate significantly with the child when able to do so" for at least one year). Therefore, we conclude that the trial court's reference to the burden of proof in paragraph six and its reference to the clear and convincing standard in paragraph nine did not indicate that the trial court inappropriately shifted the burden of proof to Father on the issue of his consent.

[26] Finally, Father argues that the trial court's findings as a whole do not support its conclusion that he failed to communicate significantly with M.H. for at least one year. He notes that his ability to communicate with M.H. while incarcerated was limited and asserts that, in spite of his incarceration, he made efforts to communicate with M.H. and asked for visitation with her.

[27] In addition to the findings of fact we discussed previously regarding Father's contact with M.H. and the reliability of his witnesses, the trial court also made

the following findings of fact relevant to the issue of Father's communication with M.H.:

> 23. While in Court for the Guardianship hearing on April 19, 2013, [Father] asked that [Maternal Grandmother] transport M.H. to Branchville Correctional facility for visitation with him.
>
> 24. [Maternal Grandmother] and Indiana Department of Child Services objected to this on the basis that M.H. did not even know [Father] because there had been no contact since [M.H.'s] infancy and because they did not believe the prison was an appropriate place for the child.
>
> 25. The Court concurred with Indiana Department of Child Services and [Maternal Grandmother] on this issue and no visitation occurred.
>
> *     *     *
>
> 36. [Father] was not present at [M.H.'s] birth.
>
> *     *     *
>
> 38. Father testified [Mother] and [M.H.] had shared a house with [him] and his wife and brother for several weeks while [M.H.] was an infant.
>
> 39. [Maternal Grandmother], Barbara Harden, and Crystal Weaver testified [Father] has never had the physical care of [M.H.].
>
> *     *     *
>
> 41. [Father] stipulated that at the time of the hearing in this matter, of the approximately 2,400 days of [M.H.'s] life, he had been incarcerated for all but 554 days.

\* \* \*

55. Since [M.H.'s] birth, [Father] has sent her one birthday card, and claims to have had Christmas presents for her, that were donated by others through the Angel Tree program, dropped off at his parents' home in December 2013.

56. Both of these two contacts only occurred after the Petition for Adoption had been filed and the adoption was contested.

\* \* \*

59. His father claimed he took [M.H.] to visit [Father] while he was in prison, his mother testified there was telephone contact, and [Father] testified there was telephone contact and she came to the prison but did not see him.

60. Father was released from his most recent incarceration in October 2014.

61. [Father] admitted he had made no attempt to see [M.H.] since his release from incarceration.

(App. 21-24).

[28] In order to preserve the consent requirement for adoption, a parent's level of communication with his or her child must be significant and also must constitute more than "token efforts" on the part of the parent to communicate with the child. *In re Adoption of C.E.N.*, 847 N.E.2d 267, 272 (Ind. Ct. App. 2006). The reasonable intent of the statute is to "encourage non-custodial parents to maintain communication with their children and to discourage non-custodial parents from visiting their children just often enough to thwart the adoptive parents; efforts to provide a settled environment for the children." *Id.*

We have previously held that we must view an incarcerated parent's communication with his or her child within the context of the incarceration. *Lewis v. Roberts*, 495 N.E.2d 810, 813 (Ind. Ct. App. 1986). Confinement alone should not constitute a justifiable reason for failing to maintain significant communication with one's child. *Id.* Incarceration, however, "unquestionably alters the means for significant communication." *Id.* What constitutes insignificant communication with a free parent may be significant in relation to an incarcerated parent with limited access to his child. *Id.*

[29] In *Lewis*, we held that an incarcerated parent had communicated significantly with his daughter where he had written her weekly and seen her every other week during the first nine months of his imprisonment. *Lewis*, 495 N.E.2d at 813. Thereafter, he wrote her two to three times a year and sent cards and gifts at Christmas, at Easter, and on her birthday, for four years in spite of the fact that she and her custodian failed to answer any of his letters. *Id.* In contrast, in *Adoption of E.A.*, this Court found that a father, who was in the Department of Correction, had not significantly communicated with his son when the father had only sent his son a birthday card and mentioned his son in a few letters to his son's mother. *In re Adoption of E.A.*, No. 78A01-1504-AD-153 (Ind. Ct. App. Sept. 2, 2015).

[30] Here, the trial court found that Father had only seen M.H. two to three times as a baby in the year before he was incarcerated. While Father testified that he saw her more frequently, it is clear that the trial court did not find that testimony credible. As we noted in *Williams v. Townsend*, 629 N.E.2d 252, 254

(Ind. Ct. App. 1994), "trial courts retain the prerogative to believe or disbelieve self[-]serving testimony." Then, during Father's incarceration from October 2009 to October 2014, he never contacted M.H. at her primary residence, her Maternal Grandmother's house. While he claims that he did talk with M.H. on the phone when she stayed at Paternal Grandparents' house, she only stayed there one weekend a month. Paternal Grandmother also testified that Father only talked to M.H. at Paternal Grandparents' house "if she was there when he called." (Tr. 130). The trial court did not find that he otherwise communicated with M.H., either through letters or visits. Father did send her one birthday card and arranged to have Christmas presents delivered for her, but both of these events occurred after Maternal Grandmother petitioned to adopt M.H. He did not make any attempts to send any cards or gifts during the other years of M.H.'s life that he was incarcerated. We have previously noted that a parent's conduct after the petition to adopt has been filed is wholly irrelevant to the determination of whether the parent failed to significantly communicate with the child for any one year period. *In re Adoption of S.W.*, 979 N.E.2d 633, 640 n.3 (Ind. Ct. App. 2012).

[31] In light of all of these factors, we conclude that the trial court did not err in determining that Father had failed to communicate significantly with M.H. for

more than a year.[3]  Thus, the trial court also did not err in concluding that Father's consent was not required for M.H.'s adoption.

[32]     Affirmed.

Vaidik, C.J., and Robb, J., concur.

---

[3] Because we have concluded that the trial court did not err in determining that Father had failed to communicate significantly with M.H. for more than a year, we need not address Father's remaining arguments regarding the trial court's conclusion that he had failed to pay child support for her for more than a year. *See In re Adoption of O.R.*, 16 N.E.3d 965, 973 (Ind. 2014) ("[T]he statute is written in the disjunctive such that the existence of any one of the circumstances provides sufficient ground to dispense with consent.").