# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 23 2018, 5:56 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT, RI.L

Kimberly A. Jackson
Indianapolis, Indiana

ATTORNEY FOR APPELLANT, R.O.

Mark Small
Indianapolis, Indiana

ATTORNEY FOR APPELLEES

MacKenzie J. Breitenstein
Rochester, IN

## IN THE
# COURT OF APPEALS OF INDIANA

In re the Adoption of B.L., S.L., and R.L.

Ri.L. and R.O.,

*Appellants-Respondents*,

v.

C.M. and B.M.

*Appellees-Petitioners.*

July 23, 2018

Court of Appeals Case No.
52A02-1711-AD-2753

Appeal from the Miami Circuit Court

The Honorable A. Christopher Lee, Special Judge

Trial Court Cause No.
52C01-1701-AD-3

**Brown, Judge.**

[1] Ri.L. and R.O. ("Appellants"), the biological father and mother of B.L., S.L., and R.L. ("Children"), appeal the trial court's decree granting the petition of C.M. ("Adoptive Father") and B.M. ("Adoptive Mother," and collectively, "Adoptive Parents") for the adoption of Children. Appellants raise one issue which we revise and restate as whether the court erred in granting Adoptive Parents' petition for adoption over the objection of Appellants. We affirm.

## Facts and Procedural History

[2] On April 3, 2006, B.L. was born; on June 23, 2008, S.L. was born; and on January 31, 2011, R.L. was born. In November 2011, the Department of Child Services ("DCS") conducted a relative placement of Children with Adoptive Parents as part of the Child in Need of Services ("CHINS") investigations following foster placement. When removed from the home, Children were dehydrated and severely malnourished and had to be hospitalized. During the CHINS investigations, Appellants were initially allowed unsupervised visits with Children, but the visits later became supervised. At the request of Appellants, Adoptive Parents agreed to assume guardianship of Children in order to avoid DCS filing petitions to terminate Appellants' parental rights. In April 2012, Adoptive Parents were appointed as guardians of Children, and DCS closed the CHINS cases. After the guardianship was granted, Adoptive Parents maintained the same supervised visitation model that had been in place during the CHINS cases. Appellants were ordered to pay fifty dollars weekly for support of Children. When Appellants divorced in "May or June of

[2012]," each was then responsible for twenty-five dollars weekly. Transcript Volume I at 28, 42.

[3]     On January 30, 2017, Adoptive Parents filed a Petition for Adoption seeking to adopt Children. On August 16, 2017, the court held a contested hearing on the issue of parental consent to the adoption, where all parties were present and represented by counsel.

[4]     Adoptive Mother testified that, when she and Adoptive Father became guardians, it was agreed that when R.O. received her schedule on Fridays, she would contact Adoptive Parents and they would make arrangements for the following week to see Children. During her testimony, Adoptive Mother stated that she and Adoptive Father had resided at the same address for "twenty-four plus" years and had retained the same phone number that R.O. called the night of Christmas 2013 for "twenty-four plus" years. *Id.* at 30. The court admitted a spreadsheet as Petitioner's Exhibit 1 that Adoptive Mother had created from her desk calendar to record the dates Appellants visited Children. Petitioner's Exhibit 1 indicates that R.O.'s last visit was on October 4, 2013[1] and Ri.L.'s last visit was on April 5, 2015.

[5]     Adoptive Mother testified about a call she received from R.O. on December 25, 2013, during which R.O. requested to see Children in thirty minutes. Adoptive

---

[1] Adoptive Mother testified that the last time R.O. "saw the boys was October 5, 2013." Transcript Volume I at 29.

Mother stated she told R.O. that they had guests over, that R.O. could not be accommodated, that R.O. "hadn't been much of a mother," and that they would need to discuss her visiting the boys. *Id.* at 29. Adoptive Mother testified that R.O. hung up on her and that was the last phone call she made to Adoptive Mother.

[6] Adoptive Mother testified further that she had seen R.O. at a Wendy's in Peru, Indiana, in December 2014, but that R.O. avoided her and they did not speak. She testified she received a letter from R.O. addressed to her, not Children, in January 2015, which she characterized as "fifteen excuses of why we haven't heard from her in over a year." *Id.* at 31. Adoptive Mother indicated that the letter contained R.O.'s current contact information and that she did not respond to the letter.

[7] Adoptive Mother testified that Ri.L.'s contact with Children was "very sparse." *Id.* at 32. She indicated that he would frequent a church fellowship meal before Sunday church and stated:

> [D]epending on what time you got there, you had fifteen minutes or so. A lot of times he showed up there. Sometimes we were there or sometimes we wouldn't be. Like I said we never knew whether he was coming. I only documented in my calendar one time that he actually contacted [Adoptive Father] and [Adoptive Father] met him at the church with [B.L. and S.L.] for a visit for over an hour.

*Id.* Adoptive Mother testified that R.O. filed for visitation after she and Adoptive Father filed for adoption, that R.O. "quit paying in September of '13,

. . . until we received three payments of $200 in May,"[2] and that Ri.L.'s last support payment was in January 2015. *Id.* at 36.

[8]     Adoptive Father testified:

> [Adoptive Mother and I] went out of our way and did lot's [sic] and lot's [sic] of counseling with – I did a lot with [Ri.L.] We did with both of them trying to help them change things they were doing so they could get their children back. That was the whole goal. Other family members did also. They met with our – pastor, DCS counselors and they didn't seem to change a single thing. They actually seem to have gotten worse.

*Id.* at 50-51.

[9]     He testified that they sold a vehicle to Ri.L. so he would be able to comply with the DCS requirement of having sufficient space to "haul three car seats," but that, shortly after, Ri.L. sold the vehicle for a truck that did not comply with the DCS requirement. *Id.* at 51. Adoptive Father testified that R.O. expressed interest shortly after the divorce in obtaining custody of Children and that, in response to her interest, he asked her to submit a budget and childcare plan. Adoptive Father testified:

> [R.O.] did turn in some stuff. The budget didn't take into account for extra groceries, gas, books for school. I mean all of that kind of stuff. It was [a] very, very, rudimentary budget. The childcare plan relied on three co-workers to watch [Children] for free. And the schedule would have been made a logistic[s]

---

[2] Court Finding 43 indicates that the payments R.O. made after the petition was filed totaled $200.00.

professor cry. She was asking each co-worker to watch [Children] at four in the morning when she would go into work at the Deli. One of the co-workers was a single male that had never had any experience with children that we know of. So when she turned that into us we put together a list of questions that we wanted answered. And was quite extensive about, you know, childcare and people and other[s] that were going to be watching them. Who else was going to be in the home and safety of [Children], things like that. All kinds of different questions on money. I provided her with a sample budget to help her put together a better budget. She never answered any of the questions or filled out another budget. She decided that she wasn't ready at that time to have [Children] back. And that was the only time.

*Id.* at 52.

[10] Kurt Kiefer, the court appointed special advocate director at the time of the CHINS investigations, testified there were concerns with Appellants' supervised visits with Children. He indicated that some of the concerns with R.O.'s visits included the feeding of Children, the foods that were offered, and the supervision of Children that occurred while he was there. Kiefer indicated there were similar concerns with Ri.L., but that Ri.L. additionally had anger issues that would "come out during visits of [Children] wanting to play or do something." *Id.* at 70-71. When asked if there would be any ongoing concerns if visits were to resume between R.O. and Children, Kiefer answered, "I think that it would need to be supervised by a third party if there were to be visits and have that individual make that decision if they need to continue or not." *Id.* at 71.

[11]    R.O. testified that Adoptive Mother's calendar was "relatively accurate," and stated "there was quite a few times actually that the [Adoptive Parents] had cancelled because of different things." *Id.* at 75. R.O. answered affirmatively when asked "until the adoption was filed you hadn't filed any petitions in the [c]ourt to try and get visitation or anything," and stated:

> I didn't know I had the option to do that because when I originally gave up guardianship I was under the impression that -- the DCS had told me that the guardianship was -- would make it that the guardians would be the ones that said what [Children] did. That they would have authority over [Children] and so I thought that meant that I didn't have any way of fighting if they didn't want me to be at visits.

*Id.* at 79.

[12]    R.O. further testified that she could not pay her weekly support because of her financial situation. She admitted to being "[s]omewhere around" "over $4,000.00 behind" in child support and stated that she was paying for college and vehicles, and that she did not have "one extra single dollar" she could have paid toward her support obligation. *Id.* at 84, 86. She also testified that, at the time of the hearing, she did not have a place for Children to live with her, but as soon as "[she] got that in order [she] would like for them to be in [her] home," and that she was asking for the guardianship to continue and her parental rights not to be terminated. *Id.* at 82.

[13]    Ri.L. testified that he received $735.00 in monthly SSI benefits. He agreed that Adoptive Mother's timeline of visits was correct and that he did not have

unsupervised visitation when DCS was involved, and stated that he visited Children "as much as [he] could." *Id.* at 89. Ri.L. stated that Children would ask him to come to their programs and sporting events, and that he would "let them know . . . it's got to be okay with [Adoptive Parents] first," and he would "never ever hear anything" from them so he "figured it was never okay." *Id.* at 90. When asked what made him think he could not go to a public place and watch Children play a sport, Ri.L. stated, "I didn't want to do anything to upset them by showing up or, I mean I love [Children], but I just did not want to cause no problems by showing up when I didn't have the okay." *Id.* at 90. When asked why he did not go over and try to speak with Children when he saw them at Denver Days, he replied, "I did not want to cause no problems. I'm – yes, I would [have] loved to go up and talk to [Children] and it killed me seeing them down the street from me and not even being able to tell them hi." *Id.* at 90-91. He stated that Ri.L. bought B.L. some boots in June 2014 and brought Easter baskets to Children in April 2015.

[14] Ri.L. further testified that he felt like he was not wanted around so he just kept his distance and, when asked if he was under the impression that he could not visit, he stated, "[m]ore or less, yes." *Id.* at 92. Ri.L. indicated he called Adoptive Father's cell phone to schedule a time when Adoptive Father could inspect Ri.L.'s new dwelling so his visits with Children could occur somewhere besides the church, that he never received a return phone call, and that Adoptive Father never showed up. When asked whether he made other attempts to contact Adoptive Parents, he answered, "I kind of like backed off."

*Id.* at 94. Ri.L. further testified that he did not pay his weekly ordered child support because he "hit a rough spot and [has been] trying to get it where he can start paying on it." *Id.* at 95. Ri.L. stated that the last time he paid child support was in 2015 or 2016 and that he had not paid any support in 2017. He stated that he last spoke with Adoptive Father on Easter in 2015 "except for when I – after I got my new place." *Id.* at 97. He agreed that he had spoken to Adoptive Father "on the phone so they have the same telephone number." *Id.* at 99.

[15] On September 1, 2017, the court issued an order which stated in part:

### FINDINGS OF FACT

\* \* \* \* \*

6. [Ri.L.] and [R.O.] were married at the time of the births of [Children].

\* \* \* \* \*

8. In 2011, [DCS] became involved with [Ri.L.] and [R.O.] and filed CHINS cases due to allegations of poor home conditions, lack of supervision of [Children], and not proper[] feeding . . . .

9. [Children] were severely malnourished and required medical treatment.

\* \* \* \* \*

12. [Adoptive Father] and [Ri.L.] are cousins.

13. [Appellants] contacted [Adoptive Parents] to see if they would consider being the relative placement for [Children].

* * * * *

15. On November 5, 2011, [Children] moved into [Adoptive Parents'] home.

* * * * *

18. In February of 2012, the youngest child, [R.L.], ate cigarette butts during an unsupervised visit and became extremely ill, and DCS modified visits for [Ri.L.] and [R.O.] to be supervised visits.

19. [Adoptive Parents] attempted to help [Ri.L.] and [R.O.] comply with DCS's requirements for them, including selling them a suburban for only $500.00 so they could meet the requirement of having a vehicle that would hold three car seats.

20. Prior to having paid Adoptive Parents] the full $500.00 for the vehicle and shortly after receiving the vehicle, [Ri.L.] and [R.O.] sold the suburban and obtained a truck which would not hold three car seats.

21. [Kiefer] was the director of the Miami County Court Appointed Special Advocate (CASA) program at the time of the CHINS cases and was involved in the CHINS cases.

22. [Kiefer] had concerns about the parents' progress in services and concerns about their visits with [Children].

23. The CHINS cases were not progressing well and were headed toward termination of parental rights.

24. [Adoptive Parents] agreed to assume guardianship of [Children] in order to avoid DCS filing petitions to terminate the parental rights of [Appellants].

25. On May 2, 2012, [Adoptive Parents] were appointed as guardians of [Children], and DCS closed out the CHINS cases.

* * * * *

29. [Appellants] were to contact [Adoptive Parents] each week to schedule the visits for the following week so the visits could be scheduled around the [Appellants'] schedules.

30. In March of 2013, [R.O.] asked [Adoptive Parents] about getting custody of [Children] back.

31. [Adoptive Parents] requested that [R.O.] provide them with a budget and a daycare plan so they could determine if it was safe and appropriate to return [Children] to her at that time.

32. [R.O.] provided an incomplete budget which did not account for insurance or a large enough grocery budget, and she provided a daycare plan that relied upon co-workers watching [Children] free of charge.

33. [Adoptive Parents] gave [R.O.] a budget template and made suggestions for her to change things so she could ready herself to resume full-time care of [Children].

34. Upon receiving the feedback from the [Adoptive Parents], [R.O.] determined she was not ready to have [Children] back.

* * * * *

36. On October 4, 2013, [R.O.] had her last visit with [Children].

37. [R.O.] did not call [Adoptive Parents] again about seeing [Children] until December 25, 2013, at which time she told [Adoptive Mother] she wanted to see [Children] that same day, and [Adoptive Mother] told her she could not be accommodated at that time and began to explain how hard it was on [Children] for [R.O.] to go three months without calling or seeing [Children].

38. [R.O.] hung up on [Adoptive Mother] and has not called again since.

39. [R.O.] sent a letter to [Adoptive Parents] in January of 2015 and claimed to have sent a letter in October of 2016, but [Adoptive Parents] never received that letter.

40. [R.O.] has not sent any letters or cards to [Children] since she last saw them on October 4, 2013.

* * * * *

42. As of January 30, 2017, when the adoption petition was filed, [R.O.] had not paid any child support in over three years.

43. After the adoption petition was filed, [R.O.] made a few support payments totaling $200.00, but at the time of the hearing she had not been making regular support payments and had an arrearage in excess of $4,000.00.

44. [R.O.] has been employed since the support order was entered and did have income that could have gone toward child support.

45. [Ri.L.] continued to exercise supervised visitation with [Children], but he would frequently come to church for his visits and only see [Children] during the church breakfast provided prior to Sunday school or during church services.

46. On April 5, 2015, [Ri.L.] had his last visit with [Children].

47. [Ri.L.] did not contact [Adoptive Parents] again about having visitation with [Children].

49. [Ri.L.] has not sent any letters or cards to [Children] since he last saw them on April 5, 2015.

* * * * *

51.  As of January 30, 2017, when the adoption petition was filed, [Ri.L.] had not paid any child support in two years.

52.  At the time of the hearing he had not been making regular support payments and had an arrearage in excess of $3,000.00.

53.  [Ri.L.] has been employed at various times in the five years since the guardianship was established and receives social security disability income and did have income that could have gone toward child support.

54.  [Adoptive Parents] have resided at the same address, had the same landline and cellphone telephone numbers, worked at the same jobs, and attended the same church since they took placement of [Children].

55.  [Appellants] had all of [Adoptive Parents'] contact information and knew where they attended church, having attended church there several times.

56.  Neither [Ri.L.] nor [R.O.] has been incarcerated or otherwise unable to contact [Adoptive Parents] at any point since [Adoptive Parents] took placement of [Children].

57.  [R.O.], after the filing of the adoption petition, petitioned the Court in the open guardianship cause numbers for visitation with [Children].

Appellant Father Appendix Volume II at 65-70.

[16]  The court concluded that Adoptive Parents had proven by clear and convincing evidence that Appellants' consents to the adoption were not required; that Adoptive Parents had met their burden of proof; that Appellants had abandoned or deserted Children; and that Appellants had failed without

justifiable cause to communicate significantly with Children. On October 25, 2017, the court held a final hearing and entered a decree of adoption granting Adoptive Parents' petition.

### *Discussion*

[17] The issue is whether the trial court erred in granting Adoptive Parents' petition for adoption over Appellants' objection. When reviewing the trial court's ruling in an adoption proceeding, we will not disturb that ruling unless the evidence leads to but one conclusion and the trial judge reached an opposite conclusion. *In re Adoption of T.L.*, 4 N.E.3d 658, 662 (Ind. 2014). We presume the trial court's decision is correct, and we consider the evidence in the light most favorable to the decision. *Id.*

[18] When the trial court has made findings of fact and conclusions of law, we apply a two-tiered standard of review: we must first determine whether the evidence supports the findings and second, whether the findings support the judgment. *Id.*; *see* Ind. Trial Rule 52(A) (providing that where the trial court has made findings of fact and conclusions of law, "the court on appeal shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses"). Factual findings are clearly erroneous if the record lacks any evidence or reasonable inferences to support them and a judgment is clearly erroneous when it is unsupported by the findings of fact and the conclusions relying on those findings. *In re Adoption of T.L.*, 4 N.E.3d at 662.

[19]     Ind. Code. § 31-19-9-1(a) provides in part that, "[e]xcept as otherwise provided in this chapter, a petition to adopt . . . may be granted only if written consent to adoption has been executed" by "(1) Each living parent of a child born in wedlock."  However, Ind. Code. § 31-19-9-8 provides:

(a)   Consent to the adoption, which may be required under section 1 of this chapter, is not required from any of the following:

(1)   A parent or parents if the child is adjudged to have been abandoned or deserted for at least six (6) months immediately preceding the date of the filing of the petition for adoption.

(2)   A parent of a child in the custody of another person if for a period of at least one (1) year the parent:

(A)   fails without justifiable cause to communicate significantly with the child when able to do so; or

(B)   knowingly fails to provide for the care and support of the child when able to do so as required by law or judicial decree.

* * * * *

(11)  A parent if:

(A)   a petitioner for adoption proves by clear and convincing evidence that the parent is unfit to be a parent; and

(B)   the best interests of the child sought to be adopted would be served if the court dispensed with the parent's consent.

* * * * *

(b) If a parent has made only token efforts to support or to communicate with the child, the court may declare the child abandoned by the parent.

(Subsequently amended by Pub. L. No. 113-2017, § 5 (eff. July 1, 2017)).

[20] Here, the trial court found that all the foregoing statutory provisions applied to Appellants, and Appellants challenge the court's findings with respect to each provision. "However, the statute is written in the disjunctive such that the existence of any one of the circumstances provides sufficient ground to dispense with consent." *In re Adoption of O.R.*, 16 N.E.3d 965, 973 (Ind. 2014). Because we conclude the trial court properly relied on at least one statutory provision— namely, that for a period of at least one year Appellants failed without justifiable cause to communicate significantly with Children although they were able to do so—we do not address other provisions on which the trial court may also have relied.

[21] Ri.L. argues that the court erroneously determined his consent to adoption of Children was not required. He states the court entered three erroneous findings: Finding 48, in which the court indicated the scheduling of the visit to Ri.L.'s home by Adoptive Father never took place; Finding 55, in which it found Ri.L. had all contact information of Adoptive Parents; and Finding 53, in which it found Ri.L. has been employed at various times in the five years since the guardianship was established, receives social security disability income, and did have income that could have gone toward child support. He maintains that the court's conclusion that he failed, without justifiable cause, to communicate

significantly with Children when able to do so is not supported by the evidence. He also maintains that he provided testimony as to why he had not contacted Children since April 5, 2015, that circumstances were outside his control, and that Adoptive Parents unreasonably limited his contact with Children.

[22] R.O. argues that she did not fail to communicate with her sons without justifiable cause, and that she viewed Adoptive Parents' roles as the "gatekeepers . . . to visitation" with Children. Appellant R.O.'s Brief at 12. She maintains that she wrote two letters to Adoptive Mother asking for permission to visit Children and she thought this was the proper way to seek visitation. She also argues that she felt that, every time she tried to contact Adoptive Parents to visit, they were unavailable or they would frequently cancel appointments.

[23] Adoptive Parents argue that Appellants failed without justifiable cause to communicate significantly with Children when able to do so, and that the last time Ri.L. saw Children was April 5, 2015, and the last time R.O. saw Children was October 5, 2013. Adoptive Parents maintain that the evidence does not support Appellants' claim that they thwarted Appellants' attempts to communicate with Children.

[24] One petitioning to adopt without parental consent has the burden of proving both a lack of communication for the statutory period and that the ability for communication during that time period existed. *Rust v. Lawson*, 714 N.E.2d 769, 772. (Ind. Ct. App. 1999), *trans denied*. The reasonable intent of the

statute, which requires significant communication between the biological parent and the child in order to preserve the biological parent's right to consent to the child's adoption, is to encourage non-custodial biological parents to maintain communication with their children, and to discourage such parents from visiting their children just often enough to thwart the adoptive parents' efforts to provide a settled environment. *Id.* In order to preserve the consent requirement for adoption, the level of communication by the biological parent with the child must not only be significant, but it also must consist of more than token efforts at communication. *Id.*

[25] Taken in the light most favorable to the court's findings with respect to Ri.L., the record reveals that his last visit with Children was April 5, 2015. To the extent Ri.L. testified that he did not visit Children or contact them since April 5, 2015, because "[he] felt like [he] wasn't wanted around so [he] just kept [his] distance" and was under the impression he could not visit, we observe that Ri.L. also testified that he saw Children at Denver Days but made no attempt to speak to them. Transcript Volume I at 92. Further, the record does not establish that Adoptive Parents told Ri.L. that he could not visit Children. Adoptive Parents tried to help Ri.L. comply with DCS's requirements to avoid having his parental rights terminated by selling a vehicle to Ri.L. that complied with DCS requirements. The record also reveals that Ri.L. sold the vehicle and replaced it with a truck that did not comply. Ri.L. also testified that he would "never. . . hear anything" from Adoptive Parents so he "figured it was never okay" to attend sporting events, and that, after Adoptive Father did not come to

inspect his new dwelling, he "kind of like backed off." *Id.* at 90, 94. To the extent Ri.L. argues that he did not have all contact information for Adoptive Parents, the record indicates that he did have their landline phone number, knew where they attended church, knew where they lived, and had contacted them many times previously.

[26] Taken in the light most favorable to the court's findings with respect to R.O., reveals that the last visit she had with Children was on October 4, 2013. She sent one verified letter to Adoptive Mother, not Children, in January 2015. Adoptive Father testified that R.O. expressed an interest in ending the guardianship and having Children live with her again shortly after the divorce, but when asked to complete a budget plan, R.O. did not submit a satisfactory budget, decided she was not ready for Children to live with her, and never tried again. While R.O. argues she sent a letter to Adoptive Parents in October 2016, the court found that Adoptive Parents never received the letter. Further, even if the letter had been received, it would not rise to the significant level of communication required to preserve the consent requirement of the natural parents. *See Rust*, 714 N.E.2d at 772 (noting that one two-hour visit and one fifteen minute visit with the child in a twenty-two month period was not substantial contact and were only token efforts taken by the natural father).

[27] The record further reveals that Adoptive Parents filed the petition for adoption on January 29, 2016; that they did not attempt to thwart any efforts by Appellants to communicate with Children; and that Adoptive Parents have not moved or changed their phone numbers and have attended the same church

since they took placement of Children. Thus, we conclude there was clear and convincing evidence that while Children were "in custody of another person [and] for a period of at least one (1) year [Appellants] . . . fail[ed] without justifiable cause to communicate significantly with the Children when able to do so." Ind. Code § 31-19-9-8(a)(2)(A). The Appellants' consents to the adoption of Children were not required.[3] *See In re Adoption of C.E.N.*, 847 N.E.2d 267, 268-271 (Ind. Ct. App. 2006) (holding that the natural mother failed without justifiable cause to communicate significantly with her child, and noting that communication between the natural mother and the child had been sporadic, that the natural mother had the ability to visit her child if she had chosen, and that, even though the adoptive mother gave up on the natural mother visiting with the child, the adoptive mother did not hamper communication between the natural mother and the child).

## *Conclusion*

[28] For the foregoing reasons, we affirm the decree of adoption entered by the trial court.

[29] Affirmed.

---

[3] We note that, "[e]ven if a court determines that a natural parent's consent is not required for an adoption, the court must still determine whether the adoption is in the child's best interests." *In re Adoption of O.R.*, 16 N.E.3d at 974 (citing Ind. Code § 31-19-11-1(a)(1)). Here, the court stated in its order that it was in Children's best interests to grant Adoptive Parents' petition, and Appellants do not challenge the court's determination.

Bailey, J., concurs in result.

Crone, J., concurs.