## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 18 2017, 10:44 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Benjamin R. Aylsworth
Biesecker Dutkanych & Macer, LLC
Evansville, Indiana

ATTORNEY FOR APPELLEE

Craig Goedde
Johnson, Carroll, Norton, Kent &
Goedde, P.C.
Evansville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Adoption of C.O., Minor Child,

J.O.,

*Appellant-Respondent,*

v.

J.W.,

*Appellee-Petitioner.*

October 18, 2017

Court of Appeals Case No.
82A01-1703-AD-643

Appeal from the
Vanderburgh Superior Court

The Honorable
Brett J. Niemeier, Judge
The Honorable
Renee Allen Ferguson, Magistrate

Trial Court Cause No.
82D04-1608-AD-110[1]

---

[1] We note that, by agreement of the parties, the trial court consolidated this adoption cause number with the parents' previously-filed domestic relations cause number 82D04-1301-DR-5, *Appellant's App. Vol. II* at 20, such that all pending matters were heard at a consolidated hearing, and it is from the trial court's ensuing order that J.O. appeals.

**Kirsch, Judge.**

[1]   J.O. ("Father") appeals the trial court's Decree of Adoption, which granted the petition to adopt C.O. that was filed by J.W. ("Stepfather"). Father raises one issue for our review, which we restate as: Whether the trial court erred when it determined that Stepfather proved by clear and convincing evidence that Father's consent to the adoption was not required under Indiana Code section 31-19-9-8.

[2]   We reverse and remand.

## Facts and Procedural History

[3]   C.W. ("Mother") and Father were married and had one child, C.O. ("Child"), who was born in September 2012. In January 2013, Mother filed a petition for dissolution, and in April 2013, their marriage was dissolved by Decree of Dissolution.[2] With regard to Child, the Decree of Dissolution provided that Mother would have sole legal and physical custody of Child, and Father would exercise parenting time "any time [Mother] was working and at all other times agreed upon by the parties." *Appellant's App. Vol. II* at 23. It further provided that neither party was obligated to pay the other child support, noting, "This may be a slight deviation from the attached Child Support Obligation Worksheet inasmuch as the parties contemplate sharing parenting time with

---

[2] Mother was represented by counsel during the dissolution proceedings, and Father was not.

[Child] and otherwise agree to share in [Child]'s financial expenses as further outlined herein." *Id.* The parties agreed to equally divide all uninsured medical expenses as well as all other expenses, including schooling and extracurricular activities. *Id.* The Decree of Dissolution provided that Mother and Father would alternate the tax dependency exemption.

[4] Before they separated, Father watched Child several days per week while Mother worked, and after they separated and Father moved out, "it wasn't [] consistent, but he saw [Child] when he could[,]" visiting with Child two or three days per week, including overnights. *Tr. Vol. I* at 38, 150-51. At some point, Father became involved in a relationship with a woman ("Girlfriend") and their relationship included instances of physical conflict as well as alcohol consumption. According to Mother, in 2013 and 2014, Father generally exercised visitation two or three overnights per week, noting that she "tried to keep [Father] in [Child]'s life[,]" but after an incident in April 2015, when Girlfriend called Child a racial slur while he was at Father's home, Mother sought to limit his parenting time. *Id.* at 40. To accomplish this, on April 28, 2015, Mother and Father filed an Agreed Order of Modification, in which the parties agreed to modify Father's parenting time. It provided "that [Father] have no overnights without the Mother's prior approval[,]"and stated that "[t]he parties shall agree upon days for the Father's parenting time, including

holidays."[3] *Appellant's App. Vol. II* at 28. Father was entitled to a minimum of four hours per week of parenting time, which he was required to schedule at least forty-eight hours in advance.[4] *Id.* The Agreed Order of Modification provided that "under no circumstances" was Girlfriend or any member of her family to have "any direct or indirect contact with [Child] without the Mother's prior approval." *Id.* It also modified the tax exemption arrangement, such that Mother would be entitled to claim Child each year on her tax returns. From April 2015 to October 2015, Father generally exercised his four-hours of weekly parenting time, although sometimes Father's mother, rather than Father, would exercise the four-hour visitation with Child. *Tr. Vol. I* at 45.

[5] Thereafter, on July 22, 2016, Father filed, *pro se*, a Verified Motion for Contempt Regarding Parenting Time, alleging that Mother had stopped letting him have visitation with Child and that "[i]t has been almost a year." *Appellant's App. Vol. II* at 30. About a month later, on August 18, 2016, Stepfather filed a Petition for Adoption, seeking to adopt Child, who was then three years old. At that time, Stepfather was engaged to Mother, and the two later married in December 2016. The Petition for Adoption alleged that Father (1) had, for a period of at least six months immediately preceding the Petition,

---

[3] Mother was represented by counsel at the time of the Agreed Order of Modification, and Father was not.

[4] We note that the copy of the Agreed Order of Modification that is included in the record before us has a time stamp over certain words, making it illegible as to whether the four hours was a minimum or a maximum. *Appellant's App. Vol. II* at 28. At the final hearing, counsel's questioning indicated that the four hours was a minimum, *Tr. Vol. I* at 11, 45, although Mother and Father each testified in a manner indicating that Father was entitled to four hours, which suggests it was a maximum.

"abandoned or deserted [Child]; (2) had, for a period of at least one year: (a) failed without justifiable cause to communicate significantly with [Child] when able to do so, and (b) knowingly failed to provide for [Child]'s care and support when able to do so as required by Indiana law or judicial decree; and (3) was unfit to be a parent "where [Child]'s best interests lie in dispe[n]sing with [Father]'s consent." *Id.* at 14-15.

[6] On August 30, 2016, Father, now represented by counsel, filed a Motion to Contest Adoption, asserting that Father was not consenting to the adoption, it was not in Child's best interests for the adoption to be granted, and "that Mother has purposefully and continuously denied Father access to his child." *Id.* at 18.

[7] On September 7, 2016, Father filed a Verified Petition to Modify Custody and Parenting Time, seeking to be awarded joint legal custody and asking for more defined rights concerning his parenting time and a more specific parenting time schedule. *Id.* at 31-32. He asserted that there had been a substantial and continuing change in circumstances, including that Mother was working third shift in her job, and Father was working first shift, so that he should have parenting time while she was at work including while she was working overnights.

[8] On September 13, 2016, Mother filed a Motion to Suspend Parenting Time. In it, she asserted that Father had not exercised any parenting time or had any contact with Child since October 2015 and "has, at best, had only token efforts

of communication with [Child] in nearly one year." *Id*. at 34. She also alleged that Father "has also failed to adequately provide for [Child]'s financial well being." *Id*. She asserted that as a result of Father's "lack of meaningful contact and financial support," Stepfather filed the Petition for Adoption, and Father "now wishes to attempt to exercise parenting time . . . disrupting [Child]'s new routine schedule." *Id*. at 35. Mother requested that the trial court suspend Father's parenting time until the resolution of the pending adoption matter. *Id*. On September 28, 2016, the post-dissolution matter was consolidated with the adoption action that Stepfather had filed.

[9] In January 2017, a consolidated hearing was held on Father's Motion to Contest Adoption and his Motion for Contempt Regarding Parenting Time, and Mother's Petition to Suspend Parenting Time. At the hearing, the trial court heard testimony from Mother, Stepfather, and Father.[5] Child was, at that time, four years old.

[10] Stepfather stated that he and Mother began dating when Child was one year old and that he had been living with Mother and Child for approximately two

---

[5] The transcript reflects that Mother offered, and the trial court admitted, five exhibits, which consisted of Mother's diary of dates and circumstances of Father's visits, texts between Mother and Father, Facebook snapshots, and a list of Child's daycare expenses. Father offered one exhibit, which was admitted into evidence, and it consisted of text messages between Father and Mother from October 13, 2015 through September 1, 2016. Neither party's exhibits are included in the record before us. Rather, we have only an Exhibits Volume that lists, but does not include, the exhibits, nor are the exhibits attached to or included in the transcript volumes or appendices. We remind the parties that Appellate Rule 2(K) states that the term "Transcript" means "the transcript or transcripts of all or part of the proceedings in the trial court . . . that any party has designated for inclusion in the Record on Appeal *and any exhibits associated therewith*." (Emphasis added.) Because a number of text messages were read into evidence during the hearing, we were able to discern the content of those messages.

years. Stepfather testified to being very much involved in Child's daily life and caretaking functions. Stepfather testified that, initially, Father generally exercised parenting time three days per week, including the overnights, but the arrangement changed about two years prior, and Father became less consistent and did not exercise overnight visitations. He recalled that under Mother and Father's Agreed Order of Modification, filed in April 2015, Father was entitled to a minimum of four hours of visitation per week, which had to be scheduled forty-eight hours in advance. According to Stepfather, Father would ask to see Child "occasionally," but he "rarely, if ever" scheduled it forty-eight hours in advance, and that situation caused issues with the family's routine. *Tr. Vol. I.* at 12. Stepfather stated that Father's last official visitation was in October 2015 and lasted about three and one-half hours. When asked if Father had requested any parenting time after that date, Stepfather replied, "Not in the forty-eight hour window." *Id*. at 13. Stepfather also testified to being aware of a "recent" occasion when Father arranged and visited with Child via Mother's mother ("Maternal Grandmother"), when, without Mother's knowledge or approval, Maternal Grandmother took Child over to Father's mother's home, where Father and his mother visited with Child. *Id*. at 14.

[11] With regard to Father's pending petitions for contempt and to modify custody and parenting time, Stepfather testified that "There's a long history. [Father] said several times he would just sign his rights over[.] . . . He's admitted to having a drinking problem. He's admitted to [Mother] that he was selling drugs." *Id*. at 16-17. Stepfather also testified to a history of violence between

Father and his then-girlfriend, Girlfriend, including when Child was present. Stepfather stated that, to his knowledge, the last time Father gave any money to Mother for Child was for Child's preschool costs in the fall of 2015. Stepfather was not aware of any money that Father had provided for clothes or uninsured medical expenses, but was unsure whether Mother had provided bills or documentation of expenses to Father.

[12] During her testimony, Mother stated that she, Child, and Stepfather had lived together for approximately three years, and she described the daily caretaking activities and functions that Stepfather performed, including cooking, cleaning, getting Child dressed, taking Child to doctor appointments, to and from daycare, and visits with family. *Id.* at 29. Mother testified to various expenses for Child, such as food, clothes, and expenses for his school. She stated that Father paid his share of two months of preschool tuition in August and September 2015, and then in October 2015 Father stated that he did not have money to pay and did not pay thereafter. *Id.* at 31. Mother explained that she did not keep asking Father for his share, "We never asked for money from him. I mean, when we did we didn't get it, so it's just one of those things we expect not to get from him." *Id.* She stated, "We never asked for anything else[,]" other than the preschool tuition. *Id.* at 32. Mother said that she included Father on Child's emergency contact list for preschool as Father had indicated that "he wanted to be a part of [Child's] schooling," but Father did not attend Child's school events or otherwise participate. *Id.* at 33.

[13]   Mother testified that Father had a history of issues with alcohol, describing "incidents on and off" since the time of their dissolution when Father would have been drinking, and she observed empty bottles, on one or more occasions, when she found him drunk with Girlfriend at Father's mother's home, or other times when Father's mother would come and take care of Child while Child was with Father because he and Girlfriend were intoxicated. *Id*. at 38. Mother testified that there had been physical altercations between Father and Girlfriend when Child was at their residence.

[14]   Mother explained that a particular incident occurred in April 2015, which combined with her concern about Father's use of alcohol, precipitated her decision to seek and file the Agreed Order of Modification to limit Father's parenting time: Father was exercising parenting time with Child, and he contacted Mother asking her to come and pick up Child, because Girlfriend had called Child a racial slur and told Father that Child was not allowed to be around her. Mother explained, "And so at that time, pretty much, I was done with that. So we had that modification[.]" *Id.* at 43-44. When asked if Father had voluntarily reduced his parenting time to four hours per week, Mother acknowledged that the scaled-back parenting time was at her request and stated that Father told her that Girlfriend "made him" agree to it. *Id*. at 44. According to Mother, Father sometimes, but not consistently, exercised his four-hour parenting time between April 2015 and October 2015.

[15]   Then, in October 2015, another incident occurred, causing Mother to believe Child was not safe in Father's care, such that she thereafter refused his requests

to exercise parenting time. Specifically, Mother described that she and Father had agreed for Father to exercise parenting time with Child on Saturday, October 13 during the local "Fall Festival" weekend. On that Saturday, Father was fifteen minutes late in picking up Child, and he returned Child fifteen minutes early. During the period of time that Child was with Father, Mother viewed Father's Facebook posts – which he had posted in the early morning hours on Saturday – describing being "too drunk" to drive home from the Festival on Friday night, passing out on someone's lawn, and "thanking the police [] for not takin' him to jail and [for] droppin' him off at home." *Id.* at 34-35, 59. She testified that she had not approved or agreed to arrange any subsequent visits between Father and Child since that October 13, 2015 date, because she believed Father drank too much and needed to seek assistance, and "until he did that, [] I didn't feel [Child] was safe with him." *Id*. at 37. She specifically told Father that he needed to "get help" if he wanted to see Child. *Id.* at 37, 58, 120. When asked to outline the subsequent occasions when Father requested parenting time, she replied,

A: He's never actually ever requested his time. He always just -
I don't know what you would call it, he just texts me and says,
"When can I see him? Why won't you let me see him?" But
that's about it. He never says a date and time to see him.

Q: So generally he just says, "When can I see him?", trying to
converse with you about that but doesn't say, "I would like to see
him on Saturday at 6:00?"

A: That's correct.

*Id.* at 36-37. Mother acknowledged on cross-examination that, in the past, she and Father would arrange parenting time in that way, where Father would ask for time, she would offer options, and together they would arrange a visitation.[6] *Id.* at 90-91. However, she said, "I shouldn't have to give him a date and time to see his Child. He should tell me when he wants to see him." *Id.* at 90.

[16] On November 1, Father texted Mother inquiring "how [Child's] Halloween went" and on November 12, asking "What do I have to do to get [Child] back?"; Mother did not reply. *Id.* at 102, 103. Mother testified that, in December 2015, Father texted her asking, "Will you tell [Child] I said Merry Christmas and that I love and miss him?" and she responded, "K[,]" but, she noted, Father's Christmas text did not actually request visitation with Child. *Id.* at 62, 72-73. She testified that, later that day, Father texted her stating that he had Christmas presents for Child and asked her how to deliver them, and she initially replied, "Mail them[,]" but when he said he could not mail them because of batteries, she told him to bring them by and put them in the door. *Id.* at 74. He did not respond or bring by any gifts that day, but on a subsequent day, his mother dropped off gifts at Maternal Grandmother's home. However, because there was no signed card, Mother testified that she did not know the gifts were from Father. On January 6, 2016, Father texted Mother and asked how Child was doing and if he liked his gifts.

---

[6] The record indicates that, since the dissolution, Mother and Father communicated almost exclusively through text messaging, with any phone conversation being infrequent, brief, and minimal.

[17]    According to Mother, in late January 2016 and into early February 2016, Father sent a series of text messages to Mother asking to see Child, but "he didn't ask for a specific date or a time for the four hours. He just said that he wanted his three days back[.]" *Id.* at 59. Mother told Father that her attorney would contact him. *Id.* at 92-93. Mother stated that a number of Father's texts to her indicated that he planned to move away and start over, and he also offered to start paying her $60 per month, but did not do so.

[18]    In March, Father texted Mother asking when her lawyer was going to contact him to schedule parenting time. On April 6, 2016, Father texted Mother asking, "When can I see [Child]?" and she responded, "When you take me to court[,]" because she had had "enough" of his drinking, inconsistent visits, and claims that he did not have any money and then would see his Facebook posts doing an activity that cost money. *Id.* at 66-67, 109. In June 2016, Father initiated a conversation asking Mother, "I just don't know why you've been keepin' [Child] from me." *Id.* at 67. Mother affirmed on cross-examination that she did not file any request to suspend Father's parenting time or seek supervised visits and, instead, decided not to allow Child to exercise parenting time with Father, explaining that she had full custody and believed Child was not safe in Father's care. During her testimony, Mother acknowledged that, on one occasion in August 2016, Father had visited with Child without Mother's prior knowledge or consent, when Maternal Grandmother agreed to take Child to Father's mother's home.

[19] While being cross-examined and reviewing text messages between her and Father during the period of October 2015 and September 2016, Mother acknowledged receiving texts from Father, in which he asked about Child or sought to arrange parenting time, on October 13, 14, 19, 21, and she verified that on October 21 she told Father, "[I]f you continue to blow up my phone without saying anything that's worth my time I'll file a restraining order against you." *Id.* at 100. Mother acknowledged receiving texts from Father on October 23, November 1, 12, seeking to have parenting time and asking Mother questions such as, "What do I have to do to get [Child] back?", and Mother did not reply. *Id.* at 102. Mother acknowledged receiving additional texts from Father in January, February, March, April, May, June, and July 2016, asking to see Child. *Id.* at 111-12. Father filed his *pro se* petition for contempt on July 22, 2016, and on August 18, 2016, Stepfather filed his Petition for Adoption of Child. Mother agreed that the Petition for Adoption was filed less than one year after Father had exercised the October 2015 visitation. *Id.* at 113.

[20] With regard to Father's financial support of Child, Mother estimated that, over the years, the total that Father had provided to her for Child was less than $1,500. *Id.* at 56. She acknowledged that, until the hearing on the Petition for Adoption, she had not provided Father with receipts of incurred expenses or documentation of Child's daycare costs beyond 2015, as she did not believe that he would pay it. She further explained that she did not request money from him very often because at times he was living in government-assisted housing and sometimes did not have work, and because he had a son with Girlfriend,

and she did not want to take away money from that child. Her position was: "It's never been about money." *Id*. at 56. Even so, Mother felt frustrated that if and when she did ask Father for money, he would tell her that he did not have any money, yet he appeared to able to afford "weed and alcohol[.]" *Id*. at 54.

[21] Father testified that he was not represented by counsel in the dissolution proceedings or when he agreed to the modification to four hours of parenting time in April 2015. Father explained that he generally agreed to whatever Mother wanted out of fear that she would withhold Child from him and upon her representation that she would not keep Child from him. Father testified that, since May 2015, he and Girlfriend were no longer in a relationship, although they shared a child. Father testified to passing drug screens through his employer and to having stable housing and employment since 2015. Father testified that he has never been arrested, charged, or convicted of any offenses as an adult. *Id*. at 151-52. Father testified to walking home from the Fall Festival on Friday, October 12, because he did not want to drive home after drinking, and passing out on the way, resulting in a ride home from police; he acknowledged that he was "hungover" the next day when he exercised parenting time with Child. *Id*. at 159. Father testified that he has limited his use of alcohol, does not drink on weekdays, and drinking never caused him to miss parenting time. *Id*. at 160-61, 165-66. Father testified that, after Mother indicated she would file for a restraining order, he did not contact Mother as frequently as he had been. After Father filed his petition for contempt regarding parenting time, he received a letter from Mother in the mail outlining

expenses related to Child's birth or healthcare and asking for reimbursement. Father stated that he paid Mother his portion of the two months of preschool in August and September 2015, but did not pay additional money. He asked the court to deny the Petition for Adoption and set up a parenting time schedule, noting that whatever parenting time that the court would allow, including supervised, would be fine with him, with the hope that at some point he could exercise that which is provided by the Indiana Parenting Time Guidelines. *Id*. at 177, 233.

[22] On February 28, 2017, the trial court issued a Decree of Adoption, granting Stepfather's Petition for Adoption. In the Decree of Adoption, the trial court determined that Father's consent "is unnecessary pursuant to I.C. § 31-19-9-8 inasmuch as he has failed to support the child when able to do so and has failed to have contact with the child for extended periods of time." *Appellant's App. Vol. II* at 12. The trial court found that adoption was in Child's best interest, changed Child's surname to that of Stepfather, and terminated Father's parental rights. Father now appeals.

## Discussion and Decision

[23] Father contends that the trial court erred when it determined that his consent to the adoption was not required. When reviewing a trial court's ruling in an adoption proceeding, we will not disturb that ruling unless the evidence leads to but one conclusion, and the trial judge reached an opposite conclusion. *In re Adoption of H.N.P.G.*, 878 N.E.2d 900, 903 (Ind. Ct. App. 2008), *trans. denied,*

*cert. denied*, 129 S. Ct. 619 (2008). We will not reweigh the evidence but instead will examine the evidence most favorable to the trial court's decision together with reasonable inferences drawn therefrom to determine whether sufficient evidence exists to sustain the decision. *Id.* It is the appellant's burden to overcome the presumption that the trial court's decision was correct. *McElvain v. Hite*, 800 N.E.2d 947, 949 (Ind. Ct. App. 2003).

[24] We begin by recognizing that the purpose of our adoption statutes is to protect and promote the welfare of children by providing them with stable family units. *In re Adoption of K.F.,* 935 N.E.2d 282, 289 (Ind. Ct. App. 2010), *trans. denied.* The relationship between parent and child is of such fundamental importance that adoption statutes, being in derogation of the common law, are "strictly construed in favor of a worthy parent and the preservation of such relationship." *Id.* In evaluating the parent-child relationship, however, the best interest of the child is paramount, and "our main concern should lie with the effect of the adoption on the reality of the minor child's life." *Id.*

[25] Indiana Code section 31-19-9-1 provides, in pertinent part, that a petition to adopt a child who is less than eighteen years of age may be granted only if written consent to the adoption has been executed. However, consent to adoption is not required from, as is relevant here,

> (2) A parent of a child in the custody of another person if for a
> period of at least one year the parent:

> (A) fails without justifiable cause to communicate
> significantly with the child when able to do so; or

> (B) knowingly fails to provide for the care and support of
> the child when able to do so as required by law or judicial decree.

Ind. Code § 31-19-9-8(a)(2). The provisions of this section are disjunctive, and thus either one provides independent grounds for dispensing with parental consent. *In re Adoption of D.C.,* 928 N.E.2d 602, 606 (Ind. Ct. App. 2010), *trans. denied.* If an adoption petition alleges that a parent's consent to adoption is unnecessary under subsection 31-19-9-8(a)(1) or (a)(2), and that parent files a motion to contest the adoption, "a petitioner for adoption has the burden of proving that the parent's consent to the adoption is unnecessary" under section 31-19-9-8. Ind. Code § 31-19-10-1.2. The petitioner for adoption without parental consent bears the burden of proving the statutory criteria for dispensing with such consent in Indiana Code section 31-19-9-8 by clear and convincing evidence. *In re the Adoption of M.B.*, 944 N.E.2d 73, 77 (Ind. Ct. App. 2011).

## I.  Communication with Child

[26]  Father asserts that the trial court erred by concluding that Stepfather proved by clear and convincing evidence that Father, for at least one year, failed without justifiable cause to communicate significantly with Child when able to do so. Under Indiana law, the party petitioning to adopt without parental consent has the burden of proving both a lack of communication for the statutory period and that the ability to communicate during that time period existed. *In re Adoption of C.E.N.,* 847 N.E.2d 267, 271 (Ind. Ct. App. 2006). In order to

preserve the consent requirement for adoption, the level of the parent's communication with the child must be significant, and more than "token efforts" on the part of the parent. *Id*. at 272. We have held that the purpose of the provision dispensing with consent if the parent "fail[ed] without justifiable cause to communicate significantly with the child when able to do so" is to encourage non-custodial parents to maintain communication with their children and to discourage them from visiting their children just often enough to thwart the adoptive parents' efforts to provide a settled environment for the children. *Id*. That being said, efforts of a custodian to hamper or thwart communication between parent and child are relevant in determining the parent's ability and opportunity to communicate. *In re Adoption of T.W*., 859 N.E.2d 1215, 1218 (Ind. Ct. App. 2006); *Rust v. Lawson*, 714 N.E.2d 769, 772 (Ind. Ct. App. 1999), *trans. denied*.

[27] Here, Father contends that the trial court's determination regarding his lack of communication with Child was erroneous. After review of the record, we agree. Stepfather filed his Petition for Adoption on August 18, 2016, and thus, under Indiana Code section 31-19-9-8(a)(2), we examine the one-year period preceding that date of filing. It is undisputed that from August 2015 to October 2015, Father regularly, even if not consistently, exercised his permitted four-hours of parenting time, as provided in the April 2015 Agreed Order of Modification. It is also undisputed that, in October 2015, Father exercised parenting time with Child on the Saturday following the "Fall Festival" incident. It also is uncontested that Father visited with Child at Maternal

Grandmother's home, without Mother's consent, in or around August 2016, before Stepfather filed his Petition for Adoption later that month. All of the above occurred within the relevant-one year of Stepfather's filing of his petition.

[28] To the extent that Stepfather suggests that those were token or not significant contacts, we find that the record contains undisputed evidence that Mother sought to prevent, *i.e.*, "hamper or thwart," communication between Child and Father. *T.W.*, 859 N.E.2d at 1218. Mother acknowledged that from October 2015, when she began to no longer allow parenting time, through July 2016, Father sent her numerous text messages asking about Child and requesting to see him, which, she explained, she did not allow due to her concerns that Father was drinking too much and Child would not be safe in his care. At one point, Mother advised Father to stop bothering her, or else she would seek a restraining order, and, if he came to her home, she would seek to have him prosecuted for trespassing on her property. Father, thereafter, continued to text Mother, although perhaps with less frequency, asking about Child, asking to see Child, asking how his Halloween was, wishing him a Merry Christmas, asking when and how to deliver Christmas gifts to Child, inquiring when he would hear from Mother's attorney, as she had told him he would, in order to arrange parenting time, and essentially begging Mother to let him see Child. Mother acknowledged that Father texted at least every month from October 2015 to June 2016. Eventually, Mother told Father that he would need to take her to court, so Father in July 2016 filed his *pro se* petition for contempt, alleging that Mother was not allowing him to exercise his court-ordered parenting time. In

August 2016, Father arranged through Maternal Grandmother to have an opportunity to see Child for approximately an hour at Father's mother's home.

[29] We recognize Mother's expressed concern that Father exhibited signs of excessive drinking and that he may have, at some point, sold marijuana to earn income, and consequently, she was concerned about Child's safety while in Father's care. She also expressed frustration at his lack of consistency at times and his failure to provide forty-eight hours of notice of any proposed exercise of parenting time, which caused disruption to her family's scheduling and routine. We do not express any opinion on the validity of Mother's concerns, nor on Stepfather's parenting abilities, which, we note, no party has disparaged. Our task is to determine whether Stepfather proved, by clear and convincing evidence, that Father, for a period of one year prior to the petition, failed, without justifiable cause, to communicate significantly with Child when able to do so. Given the record before us, we cannot say that Stepfather met his burden. *See McElvain*, 800 N.E.2d at 949 (reversing grant of stepfather's petition to adopt children, where father had seen children only on limited occasions within year of petition, including visits occurring at home of mutual friend without mother's knowledge, and father testified that mother had frustrated father's attempts to maintain contact with children).

## II. Support of Child

[30] Having found that Stepfather did not prove that Father failed to communicate with Child as required by statute, we now turn to the second prong of our inquiry and examine whether Stepfather proved by clear and convincing

evidence that Father failed to provide for the care and support of Child when able to do so as required by law or judicial decree. Ind. Code § 31-19-9-8(a)(2)(B). As an initial matter, we note that, with regard to the "when able to" provide support component of the statute, evidence was presented that Father was employed as a welder during the one-year period before Stepfather's Petition for Adoption was filed, received hourly pay increases during this time, and had the ability to pay. *Tr. Vol. I* at 240. Thus, to the extent that Father claims on appeal that Stepfather did not establish that Father was "able to" provide support, we reject that argument, and we turn to whether Father "fail[ed] to provide for the care and support" aspect of the statute. Ind. Code § 31-19-9-8(a)(2)(B).

[31] It is well-settled that Indiana law imposes a duty upon a parent to support his children. *In re Adoption of M.A.S.*, 815 N.E.2d 216, 220 (Ind. Ct. App. 2004). This duty exists apart from any court order or statute. *Id.* Therefore, Father clearly had a common law duty to support Child. We have held that a parent's nonmonetary contribution to a child's care may be counted as support. *E.W. v. J.W.*, 20 N.E.3d 889, 897 (Ind. Ct. App. 2014), *trans. denied*; *In re Adoption of N.W.*, 933 N.E.2d 909, 914 (Ind. Ct. App. 2010), *trans. granted*, *opinion adopted*, 941 N.E.2d 1042 (Ind. 2011); *M.B.*, 944 N.E.2d at 77.

[32] In the present case, the Decree of Dissolution provided that neither party would pay child support to the other, but the parties agreed to equally divide all uninsured medical expenses for Child, as well as "all other expenses including, but not limited to, schooling, extracurricular, and other controlled expenses."

*Appellant's App. Vol. II* at 23-24. Mother testified that Father paid his equal share of Child's preschool expenses for the months of August and September 2015, but then quit paying in October 2015, which we observe was the month that Mother stopped allowing parenting time due to her concerns with Father's consumption of alcohol. In her testimony, Mother estimated that, since the parties' dissolution in April 2013, Father had paid a total of $1,500 toward the support of Child.

[33] Mother acknowledged that the preschool costs were all that she, at any point, asked Father to pay and that she did not regularly provide documentation or receipts to Father of other incurred medical or extracurricular expenses. While testifying, Mother stated, on several occasions, that she generally did not ask for money or seek reimbursement or contribution from him, in part because she anticipated that Father would tell her that he did not have any money, given that he lived in government-subsidized housing, had another child, and had told her before that he had no money. She stated, "We never asked for money from him. I mean, when we did we didn't get it[.]" *Tr. Vol. I* at 31. Mother further explained that another reason that she did not pursue support or reimbursement was because, in her view, "money's not the issue here," suggesting that her focus and concern was with parenting time issues and not support issues. *Id.* at 134; *see also id.* at 56 ("[I]t's never been about money.").

[34] Also relevant to the analysis is the fact that, in April 2015, Father agreed to the terms of the Agreed Order of Modification, which, in addition to reducing Father's parenting time to four hours per week, provided that Mother would be

entitled to claim the tax exemption every year, rather than in alternating years as the Decree of Dissolution had provided.[7] We agree with Father that transferring the tax exemption to Mother could, at least potentially, "provid[e] an ongoing financial benefit for [Mother] and ultimately [Child]." *Appellant's Br.* at 18.

[35] Taking into consideration that, other than the 2015 preschool costs, (1) Mother did not provide Father with documentation or receipts; (2) Mother did not otherwise ask Father to contribute to expenses during the one-year period in question, (3) Father paid preschool expenses for August and September 2015, which was within one year of the Petition for Adoption, and (4) Father gave Mother the monetary benefit of claiming Child as a tax exemption every year, we find that Stepfather did not prove by clear and convincing evidence that Father failed to provide support for Child, as required in order for Father's consent to be rendered unnecessary under Indiana Code section 31-19-9-8(a)(2).

[36] In sum, we conclude that Stepfather failed to meet his burden to prove, by clear and convincing evidence, that Father, without justifiable cause, failed to communicate significantly with Child when able to do so, or that he failed to provide support within the year that preceded the filing of the Petition. Therefore, Stepfather has not met his burden of showing that Father's consent is not required for the adoption, and the trial court erred when it granted

---

[7] We note that, in this Agreed Order of Modification, Mother did not seek to require Father to begin making child support payments, although his parenting time was being significantly reduced.

Stepfather's Petition for Adoption Child without Father's consent.  We reverse and instruct the trial court on remand to vacate the Decree of Adoption, reinstate Father's parental rights, and restore Child's surname to that of Father.

[37] Reversed and remanded with instructions.

[38] Najam, J., and Brown, J., concur.